# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                    Plaintiff,

v.                                                Case No. 97-CR-98-1-JPS

KEVIN P. O'NEILL,

                    Defendant.                    **ORDER**

---

## 1.      COMPASSIONATE RELEASE PROCEDURAL HISTORY

On May 9, 2022, Defendant Kevin P. O'Neill ("Defendant") filed a pro se motion for compassionate release or, alternatively, for a reduction in sentence. ECF No. 2285. On August 25, 2022, the Government moved to stay briefing on Defendant's motion pending the Seventh Circuit's decision in *United States v. Williams*, No. 22-1212 (7th Cir. Feb. 10, 2022). ECF No. 2303. In *Williams*, the Seventh Circuit considered an "unresolved legal question" that Defendant raised in his motion: "whether a life sentence mandated by the sentencing guidelines prior to [*United States v.*] *Booker*[, 543 U.S. 220 (2005)] is an 'extraordinary and compelling reason' for compassionate release." *Id.* at 2. The Court granted the motion. ECF No. 2304. On April 13, 2023, the Seventh Circuit decided *Williams* and reiterated its holding in *United States v. Thacker*, 4 F. 4th 569 (7th Cir. 2021) that "a nonretroactive statutory sentencing change cannot be transformed into one that is retroactive by the device of compassionate release"; in other words, the *Williams* defendant's life sentence mandated by pre-*Booker* sentencing guidelines was not an extraordinary and compelling reason for

compassionate release. *United States v. Williams*, 65 F.4th 343, 346 (citing *Thacker*, 4 F.4th at 574); *id.* at 347–48.

Subsequent to the Court's order staying briefing pending the Seventh Circuit's decision in *Williams*, Defendant filed (1) a motion to compel the Bureau of Prisons (the "BOP") to release surveillance video of three assaults described in Defendant's motion for compassionate release, ECF No. 2317; (2) a motion for the Court to take judicial notice of certified transcripts from proceedings in a co-defendant's case, ECF No. 2323; and (3) a declaration containing supplemental medical information, ECF No. 2332.

In light of these new filings, as well as additional "supplemental materials" that Defendant had served directly on the Government, on May 9, 2023, the Government moved for an extension of time to submit its response to the motion. ECF No. 2333. The Court granted the motion. ECF No. 2336. However, shortly thereafter, on May 19, 2023, Defendant moved for leave to submit supplemental briefing in support of his underlying compassionate release motion "after the [November 1, 2023 presumptive] effective date of the [United States] Sentencing Commission's . . . promulgated amendments to U.S.S.G. Section 1B1.13." ECF No. 2338 at 1. The Government concurred with Defendant's request and "propose[d] that it be allowed to file an omnibus response to [Defendant's] various filings, including the underlying compassionate release motion and [Defendant's] supplemental brief" at that time. ECF No. 2340 at 2.

The Court granted Defendant's motion. ECF No. 2341. Defendant filed his supplemental brief (styled as a supplemental "motion" for compassionate release or, alternatively, a reduction in sentence) on December 4, 2023. ECF No. 2356. The Government filed its omnibus

response on January 18, 2024, ECF No. 2362, and Defendant filed his reply brief on March 15, 2024, ECF No. 2368. The Court has also received several letters from Defendant's friends and family in support of his compassionate release motion and associated filings. ECF Nos. 2287, 2289, 2291, 2295, 2300, 2301, 2357, 2358, 2285-1 at 151–210.

The matter is now ripe for the Court's review. For the reasons set forth herein, the Court will deny Defendant's underlying motion for compassionate release or a reduction in sentence, ECF No. 2285, as well as his supplemental motion for compassionate release or a reduction in sentence, ECF No. 2356. The Court will deny Defendant's motion to compel the BOP to release surveillance videos, ECF No. 2317, but it will grant his motion for the Court to take judicial notice of certified transcripts from proceedings in a co-defendant's case, ECF No. 2323.[1]

## 2. CRIMINAL CASE PROCEDURAL HISTORY

In June 2000, following a three-month jury trial, the jury convicted Defendant of six federal offenses: Count One, conducting the affairs of an enterprise, the Outlaws Motorcycle Club (the "Outlaws"), through a pattern of racketeering, in violation of 18 U.S.C. § 1962(c) (the Racketeer Influenced and Corrupt Organizations Act or "RICO"); Count Two, conspiracy to conduct the affairs of the Outlaws through a pattern of

---

[1]Nearly every single filing over the litigious two-year history of these compassionate release proceedings is accompanied with a motion to restrict access to the filings to only the parties and the Court, ECF Nos. 2316, 2324, 2331, 2337, 2355, 2363, 2367, or a motion to seal, ECF Nos. 2339, 2361. The Court will grant all the motions to restrict, and it will grant the motions to seal, as modified, such that they only restrict the subject docket entries to case participants and the Court rather than seal the subject docket entries. *See* Gen. L.R. 79(d)(1). All documents and attachments docketed at ECF Nos. 2317, 2323, 2332, 2338, 2340, 2356, 2362, 2364, and 2368 will be docketed in restricted form and shall remain as such until further order of the Court.

racketeering, in violation of 18 U.S.C. § 1962(d); Count Three, conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2; Count Five, assault with a dangerous weapon, in violation of 18 U.S.C. § 1959(a)(3); and Counts Six and Seven, interstate transportation of explosives with intent to kill, in violation of 18 U.S.C. § 844(d). ECF No. 1527; ECF No. 2362 at 2–3; *O'Neill v. United States*, No. 04-CV-461, 2007 WL 2042250, at *1 (E.D. Wis. July 11, 2007); *see also* Presentence Report ("PSR") at 1–4.

The criminal activity occurred during and as part of a violent war with rival motorcycle gangs over territory. PSR at 6–21. Defendant's RICO convictions were based on eighteen proven racketeering acts, including murder; various attempted murders and conspiracies to commit murder of and/or arson towards rival bikers, including through the use of explosive devices; robbery and assault of rival biker club members and associates; and cocaine delivery. *Id.* at 1–4 (as to Defendant, proven racketeering acts were Acts 1, 2, 5, 6, 7, 9, 10, 11, 13, 14, 15, 16, 19, 20, 21, 22, 23, 34). On December 19, 2000, this Court sentenced Defendant to two concurrent life sentences on Counts One and Two; a concurrent 240-month sentence on Counts Three, Five, and Six; and a concurrent 120-month sentence on Count Seven, for a total sentence of life in prison. ECF Nos. 1736, 1741.

Defendant appealed to the Seventh Circuit Court of Appeals, which affirmed his conviction and sentence. *United States v. Warneke*, 310 F.3d 542 (7th Cir. 2002). The Supreme Court subsequently denied Defendant's petition for a writ of certiorari. *O'Neill v. United States*, 538 U.S. 1035 (2003). In May 2004, Defendant filed a pro se motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255, which the Court denied. *O'Neill*, 2007 WL 2042250. The Seventh Circuit denied Defendant a certificate of

appealability. *O'Neill v. United States*, No. 04-CV-461-JPS, ECF No. 56 (Oct. 14, 2008). The Supreme Court again subsequently denied Defendant's petition for a writ of certiorari. *O'Neill v. United States*, 556 U.S. 1160 (2009). In September 2013, the Court denied a final motion for reconsideration pertaining to the § 2255 proceedings. *O'Neill v. United States*, No. 04-CV-461-JPS, ECF No. 61 (Sept. 12, 2013).

Almost five years later, Defendant filed a motion for relief from judgment in this case. ECF No. 2196; *see also United States v. O'Neill*, No. 18-CV-989-JPS, 2018 WL 10094281, at *1 (E.D. Wis. June 28, 2018). The Court was obliged to recharacterize the motion as one under § 2255 and denied the motion as an uncertified second or successive motion under § 2255(h). *O'Neill*, 2018 WL 10094281 at *2 (citing *Melton v. United States*, 359 F.3d 855, 857–58 (7th Cir. 2004) and § 2255(h)). In 2017 and 2018, Defendant pursued two unsuccessful successive collateral attacks under § 2255(h) and a petition for a writ of mandamus. ECF No. 2203. In the interim, and since, Defendant has also filed a number of Freedom of Information Act proceedings in this District and in the Western District of Wisconsin seeking documents and information related to his criminal case. *See O'Neill v. U.S. Dep't of Just., F.B.I.*, No. 06C671, 2007 WL 1521530 (E.D. Wis. May 23, 2007); *O'Neill v. U.S. Dep't of Just.*, No. 05-C-0306, 2008 WL 819013 (E.D. Wis. Mar. 25, 2008); *O'Neill v. U.S. Dep't of Just.*, No. 16-C-425, 2017 WL 384334 (E.D. Wis. Jan. 25, 2017); *O'Neill v. U.S. Dep't of Just. Exec. Office for U.S. Att'ys*, No. 18-CV-396-JDP, 2020 WL 905869 (W.D. Wis. Feb. 25, 2020). These compassionate release proceedings followed in May 2022.

3.  **LEGAL STANDARD**

The Court can modify a term of imprisonment "upon motion of the defendant after the defendant has fully exhausted all administrative rights

to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or thirty days after the warden at the defendant's facility has received such a request for release, "whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). There must be "extraordinary and compelling reasons warrant[ing] such a reduction." *Id.* § 3582(c)(1)(A)(i).

Section 3582(c)(1)(A) instructs that a reduction must also be "consistent with applicable policy statements issued by the [United States] Sentencing Commission" (the "Commission"). *See also United States v. Black*, No. 05 CR 70-4, 2024 WL 449940, at *4 (N.D. Ill. Feb. 6, 2024) ("Congress directed the . . . Commission, in policy statements, to 'describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples.'") (quoting 28 U.S.C. § 994(t)).

In 2020, the Seventh Circuit held that the relevant policy statement, U.S.S.G. § 1B1.13, was inapplicable to prisoner-initiated motions for compassionate release. *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) ("Section 1B1.13 addresses motions and determinations of the Director, not motions by prisoners. In other words, the . . . Commission has not yet issued a policy statement 'applicable' to [a prisoner's] request."). Therefore, because there was no applicable policy statement, the Seventh Circuit explained that courts have discretion when determining what constitutes an "extraordinary and compelling" reason warranting compassionate release. *Id.* ("[T]he trailing paragraph of § 3582(c)(1)(A) does not curtail a district judge's discretion. Any decision is 'consistent with' a nonexistent policy statement.").

However, November 1, 2023 amendments to § 1B1.13 clarify that, in addition to "expand[ing] the list of specified extraordinary and compelling

reasons that can warrant sentence reductions," "the applicability of the policy statement [is extended] to defendant-filed motions . . . ." U.S. SENT'G COMM'N, *Amendments to the Sentencing Guidelines, Policy Statements, Official Commentary, and Statutory Index* 7, *available at* https://perma.cc/P7TS-LMXQ (last visited May 23, 2024). Thus, it appears that the Seventh Circuit's prior determination of inapplicability of the policy statement will change. *See United States v. Thacker*, 4 F.4th 569, 573 (7th Cir. 2021) ("*[U]ntil* the . . . Commission updates its policy statement to reflect prisoner-initiated compassionate release motions, district courts have broad discretion to determine what else may constitute 'extraordinary and compelling reasons' warranting a sentence reduction.") (emphasis added).

Nonetheless, the distinction is ultimately academic. Courts retain discretion under the "catchall" provision of § 1B1.13 to find "any other circumstance or combination of circumstances" that are "similar in gravity" to those specifically enumerated in § 1B1.13 to be extraordinary and compelling bases for release. U.S. SENT'G COMM'N, *Amendments to the Sentencing Guidelines, Policy Statements, Official Commentary, and Statutory Index* 3, 7 (referring to § 1B1.13(b)(5) as a "catchall" provision); *cf. Gunn*, 980 F.3d at 1180 (holding, prior to November 1, 2023 amendments, that "[t]he substantive aspects of the . . . Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused") (citing *Gall v. United States*, 552 U.S. 38, 49–50 (2007) and *Kimbrough v. United States*, 552 U.S. 85 (2007)).

Prior to modifying a term of imprisonment, the Court must also consider the sentencing factors set forth in 18 U.S.C. § 3553(a), if applicable. 18 U.S.C. § 3582(c)(1)(A).

## 4. DEFENDANT'S PROFFERED "EXTRAORDINARY AND COMPELLING" BASES FOR RELEASE

Defendant has been in custody since 1997, and, accordingly, he has now served approximately 27 years of his total life sentence. ECF No. 2285 at 2; ECF No. 2356 at 8; *see also* ECF Nos. 25, 113, 751. He contends that "[w]ith good time credits of 48.6 months factored in, he will have served the equivalent of a 31-year federal sentence, or nearly 80% of a *de facto* life sentence." ECF No. 2356 at 8 & n.5 (citing U.S. SENT'G COMM'N, *2022 Sourcebook of Federal Sentencing Statistics*, app. A at 202) (URL omitted)).

The instant motion and supplemental motion for compassionate release or, alternatively, for a reduction in sentence are based upon the following proffered "extraordinary and compelling" bases for release: (1) Defendant's age and "age-related and institutional-related deterioration in health," including multiple unprovoked attacks by other inmates (*see, e.g.*, ECF No. 2285 at 22, 25; ECF No. 2356 at 7, 9, 16; *see also* ECF No. 2332 (Defendant's declaration providing supplemental medical information)); (2) the Government's "pretextual lies" and "deceitful propagation of disinformation," which, combined with "the prejudicial summary of the Gauger murders in [Defendant's] PSR," has "caused some BOP staff over the years to believe he is 'culpable in this heinous act'" and created a "punitive, excess of punishment" (*see, e.g.*, ECF No. 2356 at 21–22 & n.11 (quoting ECF No. 2285 at 29–30 n.18 and citing ECF No. 2356-1 at 21–26)); (3) Defendant's life sentence and length of time served is "unjustly disproportionate to [a] similarly situated" co-defendant (*see, e.g.*, ECF No.

2356 at 27); and (4) Defendant's "substantial length of imprisonment" (*see, e.g.*, ECF No. 2285 at 22; ECF No. 2356 at 5).[2] The Court relays in turn the facts and arguments that Defendant presents in support of each ground.

## 4.1 Age and Age-Related and Institutional-Related Deterioration in Health

Defendant was 65 years old when he initiated his compassionate release proceedings. ECF No. 2285 at 2. As of the filing of his supplemental compassionate release motion, he was 67 years old. ECF No. 2356 at 9. Defendant avers that he is "old enough and has been in prison long enough," and, moreover, that a prisoner study on "physiological age" puts

---

[2]In his supplemental motion, Defendant contends that additional extraordinary and compelling bases for release include "inadequate healthcare combined with extended periods of time [in which] he experienced delays in evaluations and treatment," "separate[] orders of confinement in [special housing] and in transit for a combined 19 months as a result of three unprovoked assaults," "approximately three years of pre-trial detention with multiple transfers from one county jail to another . . . , in combination with 16 years of onerous incarceration at United States Penitentiaries," "over three years of COVID-19 restrictions and lockdown conditions," and "the years of his sentence that have been spent in medical purgatory." ECF No. 2356 at 21–23. These additional bases are incorporated in the Court's summary and analysis of Defendant's arguments related to age and age-related and institutional-related deterioration in health.

To the extent that Defendant attempts to relitigate the issue of the alleged "warrantless installation and activation of 'the bug-infested lamp,'" ECF No. 2285 at 6 n.5 (citing Defendant's direct appeal, *Warneke*, 310 F.3d 542), such an argument is inappropriately raised on compassionate release. *See infra* Section 5.1.1.1 (describing the current state of the law in the Seventh Circuit as to the necessity of preventing compassionate release motions from infringing on the direct appeal or collateral review processes). The same is true as to alleged "evidence of the government's unbecoming [prosecution] tactics and insidious fabrications" that surfaced in a book authored by a former Milwaukee Police Department detective regarding the history of the Outlaws or otherwise. ECF No. 2356 at n.11 (describing alleged constitutional violations that surfaced in a memoir published in 2015 by Milwaukee Police Department Detective Roger Hinterthuer); ECF No. 2285-1 at 2 (citing Michael Grogan, *You Gotta Be Dirty: The Outlaws Motorcycle Club in & Around Wisconsin* (2016)).

him "10 to 15 years older than [his] chronological age." ECF No. 2285 at 32–33 (citing *United States v. Hightower*, No. 93-CR-84-2-JPS, 2021 WL 461532, at *3 (E.D. Wis. Feb. 9, 2021) and Affidavit of Brie A. Williams, M.D., Professor of Medicine, University of California, San Francisco, Director of UCSF's Criminal Justice & Health Program, pg. 5, ¶ 12 (URL omitted)).

In combination with his age, Defendant raises a plethora of concerns regarding his medical conditions and the conditions at the institutions in which he has been housed over the years. During his pre-trial detention, Defendant submits that he was relocated multiple times and "[t]he transitory nature of his confinement precluded 'dental or physical exams.'" ECF No. 2285 at 25 (citation omitted). The institutions at which he was housed during this time were also contaminated with black mold and bacteria and had poor ventilation. *Id.*

After the jury returned its verdict in June 2000, Defendant was transported to the Columbia County Jail, where "he severely tore or ruptured his left Achilles tendon." *Id.* at 25–26. He suffered "substantial swelling, deformity, pain, difficulty bearing weight, and no range of motion." *Id.* at 26. Surgical repair of the injury should have occurred within seven to ten days, but jail medical staff dubbed the injury "a sprain." *Id.* After multiple complaints, Defendant was examined by a surgeon outside the institution, provided with a wheelchair and crutches, and administered an MRI, "which confirmed a severely torn Achilles tendon." *Id.* Defendant eventually received surgery in October 2000. *Id.* Defendant continues to suffer from "worsening pain in both knees exacerbated by the Achilles tendon injury," requiring him to wear compression sleeves. *Id.* at 26–27.

In May 2007, "following two months of hard and painful coughing spells, [Defendant] suffered a left inguinal hernia." *Id.* at 43 n.26. At that

time, he was housed at USP Hazelton, where health services denied his formal request for surgical repair of the injury, stating that "USP inmates no longer are provided such treatment." *Id.* Defendant "followed the administrative remedies all the way to the BOP's Office of General Counsel in Washington, DC, and was denied." *Id.* However, one week after the denial, USP Hazelton staff scheduled Defendant for an outside consultation, where the hernia was repaired. *Id.*[3]

Over the last nine years, Defendant has further sustained three concussions: two in 2012 and one in 2015. *Id.* at 27. In March 2012, Defendant asserts that he was lured outside to the recreation yard at USP Hazelton. *Id.* Three individuals—one of whom was a "dirty BOP staff" member—used "flat-out lies" and "manipulat[ion]" to direct five young inmates to attack Defendant. *Id.* at 28. Defendant was struck with a rock, causing him to lose consciousness. *Id.* Once he was on the ground, all five assailants "struck and stomped him on the head, face, and . . . body," including "twisting and pulling on [Defendant's] arms attempting to inflict permanent injury." *Id.* Prison staff deployed "Ultra Flash stun munition" to stop the assault. *Id.* Defendant had no memory of the assault once he regained consciousness, and he sustained severe head and body trauma and could not move his arms or legs. *Id.* A CT scan revealed extradural hemorrhage. *Id.* Defendant could not turn his head and "continues to date to experience varying degrees of pain and diminishing motor skills indicative of spinal damage." *Id.* at 28–29. A few months later, Defendant

---

[3]Defendant raises this injury in connection with his arguments in support of the § 3553(a) factors, *see infra* Section 5.2, as Defendant has "successfully assisted" other inmates to pursue treatment after an initial denial, ECF No. 2285 at 43 n.26, but the Court notes the injury here as relevant to Defendant's institutional concerns.

received another CT scan and a doctor advised him that "another concussion possibly could result in permanent damage or death." *Id.* at 29. His family indicates that he continues to suffer from issues with balance, dizziness, poor eyesight, and headaches. ECF No. 2285-1 at 153, 183.

In August 2012, Defendant was transferred from FCI Cumberland to USP Lee. ECF No. 2285 at 29. His first morning at USP Lee, he was walking through a corridor when "he was struck from behind knocking him unconscious to a concrete floor where he tumbled." *Id.* Defendant regained consciousness while rolling on the floor and was able to get to his feet, but realized he was "near complete blindness, seeing stars, and utterly defenseless." *Id.* He was discovered by BOP staff dazed and bloodied, and he was taken to an outside medical center for treatment. *Id.* He sustained a concussion, massive swelling, a broken tooth, a neck injury, and other cuts and bruises. *Id.* According to Defendant, it was the "same pretextual lies, disseminated by the two inmates and BOP staff member from USP Hazelton," which followed him to USP Lee and facilitated the assault. *Id.* at 29–30. The USP Lee assailant later confirmed by letter to Defendant that he had been "duped" by these lies. *Id.* at 30; ECF No. 2285-1 at 66.

In the summer of 2015, Defendant was housed at USP Atwater. ECF No. 2285 at 30. He was "the lone white prisoner in his particular housing unit" when a series of surprise attacks by "groups of Mexican and Latino prisoners numbering in the hundreds armed with weapons simultaneously attacked all the white prisoners." *Id.* at 30–31. Defendant was struck with blows to the head, as well as directly struck by flash stun munition deployed by BOP staff. *Id.* at 31. Defendant suffered cuts, bruising, and symptoms of a concussion, and as a result of the attacks, spent a combined

Case 2:97-cr-00098-JPS    Filed 05/23/24    Page 12 of 71    Document 2376

19 months in special housing and in transit. *Id.* This "[e]xtended seclusion" has inflicted psychological injuries on Defendant. *Id.*

Defendant has also persistently experienced acute back spasms, chronic neck and lower back pain, right shoulder joint pain, episodes of vertigo and dizziness, constant headaches, fatigue, anxiety, repeated respiratory issues including COVID-19 and long-haul COVID-19 symptoms, PTSD, high cholesterol, ear disorders, and myopia. *Id.* at 27 (citing ECF No. 2285-1 at 52–56). The impact of these symptoms has caused him significant psychological turmoil. *Id.* Indeed, Defendant had contracted COVID-19 at least twice at the time that he filed his original motion (and potentially an additional time in November 2019 after a visit from a friend who had just returned from Wuhan, *id.* at 13 n.10) despite receiving vaccinations and vaccine boosters. *Id.* at 27 (citing ECF No. 2285-1 at 35–48). And despite testing positive for COVID-19, BOP medical staff did not assist Defendant and instead "relocated [him] to three completely different housing units (in a 30-day period) alongside new inmates." *Id.*

Defendant further generally raises the impact of COVID-19 on the institutional setting, including the "low vaccination rate among BOP personnel" and the higher risk of acquiring COVID-19 in prison. *Id.* at 32 (citation omitted). He contends that restrictions at FCI Oxford during the pandemic made his "incarceration much more punitive than originally contemplated at the time of sentencing," which restrictions included "lockdowns, quarantining, and relocation to five different housing units (some moves in the extreme cold while seriously sick with COVID-19)." ECF No. 2356 at 23–24 n.13.

In January 2022, Defendant and other inmates in his unit became "very ill with severe flu-like symptoms" including a "chronic cough,

Case 2:97-cr-00098-JPS   Filed 05/23/24   Page 13 of 71   Document 2376

headaches, fatigue, dizziness, confusion, and brain fog." ECF No. 2332 at 1. BOP staff randomly tested inmates, including Defendant, who tested positive for COVID-19 a third time. *Id.* Defendant was moved to a quarantine unit. *Id.* While in the quarantine unit, Defendant experienced vertigo and vomiting and was denied a shower for days. *Id.* at 2. He was not seen by BOP medical staff. *Id.* He was then moved to another unit where, over the ensuing weeks, he noticed "a shiny, discoloring mark had surfaced on the left side of [his] face." *Id.* In May 2022, Defendant saw a doctor and expressed concern that he may have melanoma. *Id.* The doctor "dismissed [Defendant's] concern as an innocuous spot due to [his] age." *Id.* (citing ECF No. 2332-1 at 2).

In November 2022, the same spot developed a "slightly elevated growth" with discoloring, crust, itching, and bleeding. *Id.* (citing ECF No. 2332-1 at 2). In February 2023, Defendant reported to sick call and medical staff stated they would schedule an appointment for a specialist to examine him. *Id.* (citing ECF No. 2332-1 at 2). Defendant thereafter submitted a request to staff, reiterating his concerns that the spot may be cancer, and requested treatment as soon as possible. *Id.* (citing ECF No. 2332-1 at 2). Medical staff informed him to report to sick call to be evaluated. *Id.* (citing ECF No. 2332-1 at 2). Defendant again reported to sick call and staff "appeared to be puzzled" as to why he was directed to report there. *Id.* In March 2023, Defendant was listed on the callout to see a physician assistant, who "determine[d] [that] [Defendant] ha[d] Basal Cell Carcinoma ('BCC') skin cancer." *Id.* at 3. The physician assistant stated that he would immediately schedule an appointment for outside medical care with a dermatologist. *Id.* Defendant asserts that, according to the BOP, "[o]nce approved it can take anywhere from 2 weeks to 6 months to be scheduled

for outside medical care," *id.* (quoting ECF No. 2332-1 at 4), but that BCCs require immediate treatment to avoid invasion or reoccurrence, *id.* (citing Center for Disease Control guidance (URL omitted)).

Defendant thereafter discussed with the same physician assistant his worsening equilibrium and balance, headaches, chronic neck, back, knee, and shoulder pain. *Id.* Defendant requested that the physician assistant locate his medical records from March 2012, when he was assaulted at USP Hazelton. *Id.* The physician assistant told Defendant "for the first time" that he had sustained "crushed vertebrae in [his] neck." *Id.* at 3–4. Defendant contends that the BOP's delay to diagnose and treat his cancer, as well its 11-year failure to inform him of crushed vertebrae in his neck, demonstrates "negligence and grossly inadequate medical care." *Id.* at 4.

In general, Defendant challenges BOP staffing shortages and their "cascading effects on . . . institution[] operations." ECF No. 2356 at 17. He argues that the BOP's inability or unwillingness "to provide necessary specialized care in a timely or adequate manner" is "a reasonable expansion of the medical circumstances constituting extraordinary and compelling reasons" under § 1B1.13(b)(1)(C) and is "absolutely critical to allow [him] to bring . . . urgent and inadequately treated medical need[s] to the Court's attention." *Id.* at 18. Defendant also asserts that institution safety and security is threatened by correctional officer shortages. *Id.* at 26. Defendant argues that BOP institutional deficiencies have caused him to have to be transferred numerous times, generating "immeasurable cost" with respect to stress and anguish, as well as lost and non-transferable property. *Id.*

Indeed, in August 2023, prior to submitting his supplemental compassionate release motion, Defendant was transferred from FCI Oxford to FCI Pekin (after FCI Oxford's security level lowered) and placed in

special housing, "typically a measure that is used to punish disciplinary infractions." *Id.* at 38–39. After his release from special housing, Defendant contracted respiratory syncytial virus and coughed for weeks on end with "virtually no assistance from 'Health Services.'" *Id.* at 39. Defendant has also suffered more severe restrictions at FCI Pekin, including more time locked in his cell, and more unit-wide privilege losses. *Id.* at 39–40.

### 4.2 The Government's Alleged "Pretextual Lies" and "Disinformation" and Alleged Errors in the PSR

In his supplemental motion, Defendant makes clear that he proffers the Government's "knowing[] and intentional[] dispatch[] to the general public that [Defendant] had been convicted and sentenced to life in prison for authorizing the senseless and brutal murders of Ruth and Morrie Gauger," together with the summary of the Gauger murders in Defendant's PSR, as an "individualized circumstance[]" that has made his imprisonment "substantially more harsh and laborious than most inmates."[4] ECF No. 2356 at 21–22 & n.11; *see also* ECF No. 2285 at 29–30 n.18. Defendant alleges that the Government colluded with the media to publish

---

[4] To the extent Defendant attempts to make a prosecutorial misconduct claim, such a claim is inappropriately raised in the compassionate release context. *See infra* Section 5.1.1.1 (describing the current state of the law in the Seventh Circuit as to the necessity of preventing compassionate release motions from infringing on the direct appeal or collateral review processes); *see also Crosby v. United States*, No. 2:11-CR-00023-GZS, 2015 WL 1457430, at *11 (D. Me. Mar. 30, 2015) (adjudicating on § 2255 motion "Petitioner['s] claim[] [of] prosecutorial misconduct, [in which he] alleg[ed] that the FBI and prosecutor exaggerated [his] threats to the media organization and failed to recognize that [he] was himself being harassed by the organization and by several federal agencies"). The Court nonetheless recounts the associated factual details to the extent that they are relevant to Defendant's argument that his prison sentence has been more difficult due to these circumstances.

Case 2:97-cr-00098-JPS   Filed 05/23/24   Page 16 of 71   Document 2376

a headline story, with a picture of Defendant, which included "fabricated circumstances of the official court record from his sentencing hearing." ECF No. 2285 at 30 n.18; ECF No. 2285-1 at 68. Defendant contends that this action was "motivated to provoke public outcry against him and the [Outlaws]." ECF No. 2285 at 30 n.18. After a family member contacted the editor of the story and provided "indisputable evidence showing the utter falsity of the story," the editor printed a one-sentence retraction. *Id.* However, "putting the genie back in the bottle has taken decades," and the story has "significantly add[ed] to the punitive nature of [Defendant's] imprisonment." *Id.*

Defendant also challenges the inclusion of the Gauger murders— racketeering Act 4—in his PSR, when he was not charged with or proven guilty of being involved in that act. ECF No. 2356 at 22 n.11; *see also* ECF No. 2356-1 at 23; ECF No. 793 at 19–20 (Superseding Indictment). He asserts that "[o]ver the years a number of . . . BOP . . . staff has made derogatory comments or remarks about erroneous and prejudicial information in [his] PSR that *DOES NOT* pertain to [him]." ECF No. 2356-1 at 23. He contends that other "drug transactions, scams to acquire hydrocodone, stolen vehicles and motorcycles, and altering VIN numbers" are described in the PSR despite "[n]othing in the investigation or trial record show[ing] that he had *ANY* involvement in these particular crimes." *Id.* This information has had a number of "collateral consequences" on his time in prison. ECF No. 2356 at 22 n.11 (citing *Sibron v. New York*, 392 U.S. 40, 56 (1968)).

Finally, Defendant attaches a letter that he sent to this District's United States Probation Office ("Probation") containing an additional challenge to the description in his PSR of racketeering Act 2—the murder of Donald Wagner—an act that the jury found to be proven at trial, and

which is charged to involve Defendant. ECF No. 2356-1 at 22–24; ECF No. 793 at 18. Therein, Defendant argues that he is "actually innocent" of this crime and that the "prosecution and jury determination for this act" were the result of multiple alleged constitutional and discovery violations. ECF No. 2356-1 at 22. Probation responded, explaining that, pursuant to BOP Program Statement 5800.17(11)(c), under which Defendant purported to author his letter, *id.* at 23, Probation "ha[d] no authority to challenge" information specific to one of Defendant's offenses of conviction, *id.* at 25.

### 4.3 Sentence Disparity with Co-Defendant

Defendant next raises the "favorable plea terms" offered to a similarly situated co-defendant, even after that co-defendant's "17-year flight from justice." ECF No. 2356 at 27. That co-defendant allegedly was informed prior to the return of the Indictment in 1997 that he "should go on vacation" by a Bureau of Alcohol, Tobacco and Firearms ("ATF") Special Agent. *Id.* at 28–29 (quoting ECF No. 2288 at 21–22). The co-defendant fled to Mexico, where he lived as a fugitive until October 2014 when he was apprehended by authorities after being placed on the United States Marshals Service's Top 15 Most Wanted List. *Id.* at 28.

After the co-defendant was apprehended and as his counsel was preparing for trial, the co-defendant's counsel allegedly unearthed "a staggering discovery violation by the government." *Id.* at 30.[5] While

---

[5] To the extent that Defendant attempts to make a backdoor challenge under *Brady v. Maryland*, 373 U.S. 83 (1963), the Court again will not bite. *See infra* Section 5.1.1.1 (describing the current state of the law in the Seventh Circuit as to the necessity of preventing compassionate release motions from infringing on the direct appeal or collateral review processes); *see also* ECF No. 2356-1 at 28–30 (September 2022 letter to the Government regarding *Brady* claim). The Court nonetheless recounts the associated factual details to the extent that they are relevant to Defendant's gross sentencing disparity argument.

inspecting the physical evidence, counsel discovered a box containing documents. *Id.* (citing ECF No. 2356-1 at 36–38). Counsel took photographs of the first few pages of most of the documents and marked them to be copied. *Id.* (citing ECF No. 2356-1 at 36–38). Thereafter, an Assistant United States Attorney ("AUSA") called counsel and told counsel that he "w[asn't] supposed to see those documents." *Id.* (quoting ECF No. 2356-1 at 36–38). Among the documents was a memorandum of a meeting held in New York after the events subject to racketeering Act 13[6] took place. *Id.* (citing ECF No. 2356-1 at 36–38). Law enforcement personnel, including an AUSA from the Milwaukee office, attended the meeting. *Id.* (citing ECF No. 2356-1 at 36–38). At the meeting, the names of the killers were discussed, and none of the members of Defendant's club were mentioned or thought to be involved. *Id.* (citing ECF No. 2356-1 at 36–38). Counsel for the co-defendant authored an email, which is in Defendant's possession, stating that he "ha[s] no doubt that [his] having seen [the document] is one of the reasons that [the co-defendant was] able to reach a plea agreement." *Id.* at 31 (quoting ECF No. 2356-1 at 36–38). The co-defendant ultimately signed a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C) for a total sentence of 15 years, and the Court accepted the plea agreement. *Id.* (citing ECF No. 2170).

Defendant argues, and asserts that the Government has conceded, that he is similarly situated to this co-defendant; moreover, Defendant's criminal history score is II, while his co-defendant's is VI. *Id.* at 31–32 & n.16

---

[6]Racketeering Act 13 charges that, in September 1994, members of the Outlaws traveled to the Buffalo, New York area "heavily armed in anticipation of a violent confrontation with a significantly smaller group of Hell's Angels." PSR at 13. "An Outlaw was shot and killed, and a Hell's Angel was stabbed and killed in the ensuing melee." *Id.*

(citing ECF Nos. 2170 and 2229); *id.* at 49; ECF No. 2182; PSR at 63. Defendant also asserts that this co-defendant's absence from trial had prejudicial effects on his ability to present his case. ECF No. 2356 at 33 n.17. He contends that there is now a "massive and unjustifiable disparity" between himself and this similarly situated co-defendant "result[ing] from the timing of their two hearings, essentially brought about by virtue of [the co-defendant's] flight from justice to live as a fugitive in Mexico." *Id.* at 34–35. Defendant also asserts that his time in prison has been significantly more difficult than this co-defendant, given that the latter was "placed at a Low security prison dubbed . . . 'Camp Cupcake.'" *Id.* at 38.

### 4.4 Substantial Length of Imprisonment

Finally, Defendant raises his substantial life imprisonment sentence. He avers that "shortly after the initial indictment and his arrest," an AUSA approached one of Defendant's attorneys at a cigar shop in Milwaukee. ECF No. 2285 at 19. During this meeting, the AUSA presented Defendant's attorney with "a verbal plea offer which required [Defendant's] 'cooperation' along with 'giving up his law enforcement connections' in exchange for an '8-year prison sentence.'" *Id.* at 19–20 (quoting ECF No. 2198 at 18 n.12). Defendant rejected the offer and opted instead to go to trial. *Id.* at 20. Defendant argues that the plea offer suggests that "the government regarded as sufficient a sentence far shorter than the one that was imposed." *Id.* at 20 (quoting *United States v. Stockton*, No. ELH-99-352, 2021 WL 1060347, at *12 (D. Md. Mar. 17, 2021)). Instead, Defendant "has been imprisoned for a quarter of a century," with a total life term of imprisonment, "for a case the government deemed worthy of no more than 8 years." *Id.* at 22.

Defendant argues that "[d]evelopments in the years since [he] was sentenced in 2000 show that if he were sentenced today"—and if he provided "(at the least) the same mitigating factors" given by his co-defendant, *see supra* Section 4.3, whose "Guideline sentence was life, but [who] was sentenced to just 15 years"—a life sentence would produce a gross disparity. ECF No. 2356 at 48. Defendant points to the Court's comments at his co-defendant's sentencing,[7] where the Court noted that "the times they have changed, sentencing guidelines are no longer mandatory, priorities of law enforcement are a lot different today than they were in the '90s[, and] [y]ou are a different person today than you were in the '90s." *Id.* at 49 (quoting ECF No. 2288 at 26); *see also id.* at 49–50 (citing *Booker*, 543 U.S. 220). Defendant also presents statistics showing that the "national average for defendants sentenced in cases involving murder was 244 months" during 2021, and in the Seventh Circuit, it was 226 months. *Id.* at 51–52 (citing U.S. Sent'g Comm'n, Table 7, Sentencing Length by Type of Crime Fiscal Year 2021 (URL omitted)).

5.      **ANALYSIS**[8]

    **5.1     Extraordinary and Compelling Circumstances**

As amended, *see supra* Section 3, the policy statement in § 1B1.13 details a number of circumstances in which a defendant can be considered for a reduction in his sentence. As pertinent to Defendant's medical arguments, "[e]xtraordinary and compelling reasons exist" when

    (B) [t]he defendant is—

---

[7] The Court will grant Defendant's motion for judicial notice of these transcripts. ECF No. 2323.

[8] The Government concedes that Defendant has exhausted his administrative remedies under § 3582(c)(1)(A). ECF No. 2362 at 5 n.3.

(i) suffering from a serious physical or medical condition,

(ii) suffering from a serious functional or cognitive impairment, or

(iii) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13(b)(1)(B). Extraordinary and compelling reasons also exist when "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." U.S.S.G. § 1B1.13(b)(1)(C).

With respect to age, extraordinary and compelling circumstances exist when "[t]he defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G. § 1B1.13(b)(2).

For defendants who are victims of physical abuse, extraordinary and compelling circumstances exist when the defendant "while in custody serving the term of imprisonment sought to be reduced, was a victim of[] . . . physical abuse resulting in 'serious bodily injury,' as defined in the Commentary to § 1B1.1 . . . that was committed by, or at the direction of, a correctional officer, an employee or contractor of the [BOP], or any other individual who had custody or control over the defendant." U.S.S.G. § 1B1.13(b)(4)(B). "[T]he misconduct must be established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding

in an administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger." *Id.*

> Extraordinary and compelling reasons also exist when

> a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment[.] [In those circumstances,] a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

U.S.S.G. § 1B1.13(b)(6).

Finally, extraordinary and compelling circumstances may also be "any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described [in the policy statement] are similar in gravity to those described in [the policy statement]." U.S.S.G. § 1B1.13(b)(5).

Any of these individual circumstances, "or a combination thereof," constitute extraordinary and compelling circumstances. U.S.S.G. § 1B1.13(b); *see also United States v. Vaughn*, 62 F.4th 1071, 1073 (7th Cir. 2023) ("[N]o matter how the threshold [for 'extraordinary and compelling reasons'] is defined, a combination of factors may move any given prisoner past it, even if one factor alone does not.").

### 5.1.1 Substantial Length of Imprisonment

The Government argues that the new subsection 1B1.13(b)(6), which was added with the November 1, 2023 amendments and allows the Court to consider reducing sentences that may be considered "unusually long"

under non-retroactive "change[s] in the law," "exceeds the . . . Commission's authority and is inconsistent with [18 U.S.C. §] 3582." ECF No. 2362 at 15. Accordingly, the Court takes up Defendant's arguments regarding his substantial length of imprisonment first, before turning to the remaining proffered bases for release. The Court must answer this initial question in order to understand *which* of Defendant's arguments are viable, as it must analyze those that *are* viable in combination with one another to determine Defendant's eligibility to be considered for a sentence reduction. U.S.S.G. § 1B1.13(b). Before analyzing whether the Commission exceeded its authority with § 1B1.13(b)(6), the Court provides a bit of background on the state of the law in the Seventh Circuit prior to the addition of the subsection, as well as on the statutory landscape behind the amendment.

### 5.1.1.1 Nonretroactive or Intervening Changes in the Law Pre-November 1, 2023 Amendments

Prior to the November 1, 2023 amendments to § 1B1.13, the Seventh Circuit has repeatedly held that "extraordinary and compelling" circumstances that might justify a sentence reduction under § 3582(c)(1)(A) exclude nonretroactive or intervening changes in law. *See, e.g.*, *supra* Section 1, discussion of *Williams*, 65 F.4th 343. In 2021, the Seventh Circuit—in its formative opinion on the matter—held that the First Step Act's changes to 18 U.S.C. § 924(c) did not constitute an extraordinary and compelling basis for release. *Thacker*, 4 F.4th at 575. While district courts have broad discretion under § 3582(c)(1)(A), that "discretionary authority . . . only goes so far" and "cannot be used to effect a sentencing reduction at odds with Congress's express determination . . . that the amendment to § 924(c)'s sentencing structure apply only prospectively." *Id.* at 573–74.

Case 2:97-cr-00098-JPS   Filed 05/23/24   Page 24 of 71   Document 2376

The Seventh Circuit went on to express "broader concerns" regarding "mandatory minimum sentence[s] under some other federal statute," explaining that "the discretion conferred by § 3582(c)(1)(A) does not include authority to reduce a mandatory minimum sentence *on the basis that the length of the sentence itself constitutes an extraordinary and compelling circumstance* warranting a sentencing reduction." *Id.* at 574 (emphasis added). The "scope of discretion conferred by § 3582(c)(1)(A)" should not "allow the compassionate release statute to operate in a way that creates tension with the principal path and conditions Congress established for federal prisoners to challenge their sentences," namely, "the specific statutory scheme authorizing post-conviction relief in 28 U.S.C. § 2255 and accompanying provisions." *Id.* (citing *Hrobowski v. United States*, 904 F.3d 566, 567–68 (7th Cir. 2018)); *see also United States v. Martin*, 21 F.4th 944, 946 (7th Cir. 2021) ("[The defendant] cannot use a motion for compassionate release to challenge a potential error . . . in his sentence. To allow otherwise would circumvent the normal process for challenging potential sentencing errors, either through the direct appeal process or collaterally through a 28 U.S.C. § 2255 motion.") (citing *Thacker*, 4 F.4th at 574). Instead, nonretroactive or intervening changes to a length in sentence may be considered "in determining the length of [an otherwise warranted] reduction." *Thacker*, 4 F.4th at 575.

The Seventh Circuit confronted a similar question in *United States v. Brock*, 39 F.4th 462, 465 (7th Cir. 2022), where it analyzed the effect of a judicial decision "even if viewed as announcing new law or a new interpretation of an existing statutory provision" on its holding in *Thacker*. There, the court rejected the proposition that "'the government's admission that the [defendant's] offenses no longer support a life sentence' because of

subsequent developments in the law could constitute an extraordinary and compelling reason for purposes of § 3582(c)(1)(A) sentencing relief." *Id.* at 465–66 (quoting *United States v. Liscano*, No. 02 CR 719-16, 2021 WL 4413320, at *8 (N.D. Ill. Sept. 27, 2021)). Instead, "[j]udicial decisions, whether characterized as announcing new law or otherwise, cannot alone amount to an extraordinary and compelling circumstance allowing for a sentence reduction." *Id.* at 466. "To permit otherwise would allow § 3582(c)(1)(A) to serve as an alternative to a direct appeal or a properly filed post-conviction motion under 28 U.S.C. § 2255." *Id.*; *see also United States v. King*, 40 F.4th 594, 596 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 1784 (2023) (same).

As earlier noted, and most pertinent to this case, the Seventh Circuit again analyzed a similar question in *Williams*. There, the defendant "argued that his pre-*Booker* mandatory life sentences, combined with his exemplary prison record, constituted 'extraordinary and compelling reasons' for early release." 65 F.4th at 345 (citing *Booker*, 543 U.S. 220). The Seventh Circuit, in line with its decisions in *Thacker*, *Brock*, and *King*, rejected the argument. *Id.* at 345–46 ("[W]e see no reason to change our analysis at this time."). The court recognized, however, that at that time, "[t]he . . . Commission [wa]s in the process of studying the issue, and recently it ha[d] proposed defining 'extraordinary and compelling reasons' to include circumstances in which '[t]he defendant is serving a sentence that is inequitable in light of changes in the law.'" *Id.* at 345 (citing Sentencing Guidelines for United States Courts, 88 Fed. Reg. 7180, 7184 (proposed Feb. 2, 2023)). But "[u]ntil the Commission definitively says otherwise," the Seventh Circuit "[did] not deviate from [its] current understanding." *Id.*

The court reached this conclusion even after acknowledging that its view was shared by some circuits—the Sixth, Eighth, and D.C. circuits—

but not all. *Id.* at 347 (citing *United States v. Jarvis*, 999 F.3d 442, 445–46 (6th Cir. 2021); *United States v. Crandall*, 25 F.4th 582, 586 (8th Cir. 2022); and *United States v. Jenkins*, 50 F.4th 1185, 1200 (D.C. Cir. 2022)).[9] Specifically, "the First, Second, Fourth, and Ninth Circuits have all kept the door open to motions like [the defendant's]." *Id.* at 348 & n.1 (citing *United States v. Trenkler*, 47 F.4th 42, 48 (1st Cir. 2022); *United States v. Brooker*, 976 F.3d 228, 237–38 (2d Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020), *superseded by regulation as stated in United States v. Davis*, No. 21-7325, 2024 WL 1662931 (4th Cir. Apr. 18, 2024); and *United States v. Chen*, 48 F.4th 1092, 1099 (9th Cir. 2022)). The First, Fourth, and Ninth Circuits have held that "in the absence of binding guidance from the . . . Commission, 'district courts may consider non-retroactive changes in sentencing law, in combination with other factors particular to the individual defendant, when analyzing extraordinary and compelling reasons for purposes of § 3582(c)(1)(A).'" *Id.* at 348 & n.2 (quoting *Chen*, 48 F.4th at 1098 and citing *Ruvalcaba*, 29 F.4th at 16; *McCoy*, 981 F.3d at 288; and *United States v. McGee*, 992 F.3d 1035, 1047 (10th Cir. 2021)). And "[t]he Second Circuit has held even more broadly that district courts are not barred from considering, in combination with other factors, lawfully imposed but arguably 'unjust' or 'unusually long' sentences." *Id.* at 348 (quoting *Brooker*, 976 F.3d at 238).

In the face of the circuit split, the Seventh Circuit observed that "[t]he Supreme Court has not weighed in on this disagreement." *Id.* The court explained that, while the Supreme Court has "repeatedly rejected

---

[9]The Third and Fifth Circuits have also shared the view of the Seventh, Sixth, Eighth, and D.C. Circuits. *See United States v. Andrews*, 12 F.4th 255, 261 (3d Cir. 2021); *United States v. McMaryion*, 64 F.4th 257, 259–60 (5th Cir. 2023), *withdrawn and superseded, United States v. McMaryion*, No. 21-50450, 2023 WL 4118015 (5th Cir. June 22, 2023).

categorical rules in the sentencing context and emphasized the importance of preserving the sentencing judge's discretion 'to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue,'" these holdings "d[id] not necessarily foreclose . . . *Thacker* and its progeny." *Id.* at 348–49 (quoting *Gall*, 552 U.S. 38 and collecting cases)). *Thacker* still allows for broad discretion and consideration of nonretroactive and intervening changes of the law "at step two"—a court's determination of the *amount* of an otherwise warranted reduction. *Id.* at 349. The Seventh Circuit concluded by expressing that "the issue is teed up, and either the Commission or the [Supreme] Court (we hope) will address it soon." *Id.*

### 5.1.1.2 November 1, 2023 Amendments

In 2018, as part of the First Step Act, Congress "created a judicial power to grant compassionate release on a prisoner's own request, provided that the prisoner first allowed the [BOP] to review the request and make a recommendation (or it let 30 days pass in silence)." *Gunn*, 980 F.3d at 1179 (citing § 3582(c)(1)(A)). Before these changes, as promulgated under the Sentencing Reform Act of 1984 (the "SRA"), judicial authority to grant compassionate release depended upon a motion being filed by the BOP. *Id.*; S. Rep. No. 98-225, at 173 (1983) ("propos[ing] Section 3582(C) permitting the director of the [BOP] to petition the court for reduction of a term of imprisonment in a compelling case").

As described *supra* Section 3, in § 3582(c)(1)(A), both under the First Step Act and the SRA, Congress instructs that such a sentence reduction, when granted, must be "consistent with applicable policy statements issued by the . . . Commission." In 28 U.S.C. § 994(t), which was promulgated

Case 2:97-cr-00098-JPS   Filed 05/23/24   Page 28 of 71   Document 2376

under the SRA and reinforced as part of the First Step Act, Congress directed the Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction [under § 3582(c)(1)(A)], including the criteria to be applied and a list of specific examples." § 994(t); 88 Fed. Reg. 28254, 28258–59 (May 3, 2023) (quoting § 994(t)). The only restraint that Congress placed on the Commission in § 994(t) is that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."

However, "almost immediately after the [First Step Act] took effect, the . . . Commission lost its quorum, leaving it 'unable to update its preexisting policy statement concerning compassionate release to reflect the First Step Act's changes.'" *United States v. Carter*, No. CR 07-374-1, 2024 WL 136777, at *3 (E.D. Pa. Jan. 12, 2024) (quoting *United States v. Long*, 997 F.3d 342, 348 (D.C. Cir. 2021)). The Commission's policy statement describing extraordinary and compelling circumstances in effect at that time still "address[ed] [only] motions and determinations of the Director, not motions by prisoners," which was added by the First Step Act. *Gunn*, 980 F.3d at 1180 (citing § 1B1.13). "This 'vexing, [ ] temporary anomaly' left judges to exercise their discretion in considering whether extraordinary circumstances were present," which led to the circuit split described above. *Carter*, 2024 WL 136777, at *3 (quoting *Andrews*, 12 F.4th at 259 n.4).

Yet shortly after the circuit split formed, "the Sentencing Commission re-attained a quorum" and released "new sentencing guidelines that included an updated policy statement for compassionate release motions." *Id.* The revisions took effect on November 1, 2023, *id.*, and included the new § 1B1.13(b)(6), which expressly identifies an "unusually

long sentence" as an extraordinary and compelling basis for release. *Id.* (quoting U.S.S.C. § 1B1.13(b)(6)).

The Commission's commentary makes clear that the Commission drafted § 1B1.13(b)(6) to "respond to [the] circuit split concerning when, if ever, non-retroactive changes in law may be considered as extraordinary and compelling reasons within the meaning of section 3582(c)(1)(A)." 88 Fed. Reg. at 28258–59 (collecting cases, including *King*, 40 F.4th at 595, as representative of the Seventh Circuit's position). The Commission was influenced to address the question based on *Braxton v. United States*, 500 U.S. 344 (1991), which holds that the Commission "typically resolves such [judicial] disagreements when they relate to its guidelines or policy statements," together with the fact that the Department of Justice had, on several occasions, "successfully opposed Supreme Court review of the issue on the ground that it should be addressed first by the Commission." *Id.* at 28258 (collecting authorities).[10]

The Commission was persuaded to agree with those circuits that authorize consideration of nonretroactive or intervening changes in the law as extraordinary and compelling circumstances on several bases. First, the legislative history of the SRA had "expressly identified ['unusually long

---

[10]The Government's position now is "inconsistent with its prior litigation posture." *Carter*, 2024 WL 136777, at *7. However, "as a legal matter, prior inconsistent arguments by a party are only relevant insofar as they implicate judicial estoppel—a doctrine designed to 'prevent a litigant from playing fast and loose with the courts.'" *Id.* (quoting *In re Kane*, 628 F.3d 631, 638 (3d Cir. 2010)). "That doctrine plays no role here," as an argument for the Commission to address the issue, and a later argument that the Commission overstepped its authority, are easily squared with one another. *Id.* What's more, even if it did, there is no showing of "affirmative misconduct" here such that an estoppel claim would be successful. *Id.* (quoting *United States v. Asmar*, 827 F.2d 907, 912 (3d Cir. 1987)).

sentences'] as a context in which sentence reduction authority is needed."
88 Fed. Reg. at 28258–59 (citing S. Rep. No. 98-225, at 55). Second and third,
the Commission limited § 1B1.13(b)(6) to apply only where the change in
law would "produce a gross disparity" and to individuals "who have
served at least 10 years of the sentence the motion seeks to reduce." 88 Fed.
Reg. at 28259.

Several district courts have confronted the question now before the
Court: whether the Sentencing Commission exceeded its authority by
adding § 1B1.13(b)(6) to the policy statement. *See, e.g.*, *Black*, 2024 WL
449940; *Carter*, 2024 WL 136777; *United States v. Brown*, No. 2:95-cr-66(2),
2024 WL 409062 (S.D. Ohio Feb. 2, 2024); *United States v. Brooks*, No. 08-CR-
0061-TCK-1, 2024 WL 689766 (N.D. Okla. Feb. 20, 2024); *United States v.
Allen*, No. 1:09-cr-320-TCB, 2024 WL 631609 (N.D. Ga. Feb. 12, 2024). These
courts have come down on opposite sides of the question.

While many of these cases are now on appeal, no circuit court has
expressly decided the issue.[11] In February 2024, the Seventh Circuit "put to
the side the question whether, under the amended Sentencing Guidelines
. . . a compassionate-release motion is the proper place for th[e] sentencing

---

[11]The Third Circuit has stated in dicta that it "reaffirm[s] that
nonretroactive changes in sentencing laws are not, by themselves, extraordinary
and compelling reasons warranting sentence reduction." *United States v. Kramer*,
No. 23-1246, 2024 WL 313389, at *3 (3d Cir. Jan. 26, 2024) (citing *United States v.
Stewart*, 86 F.4th 532, 535 (3d Cir. 2023)). The Fifth Circuit has stated that it
"express[es] no view on whether [a defendant] may file a [compassionate release]
motion" based on § 1B1.13(b)(6). *United States v. Martinez*, No. 23-50418, 2024 WL
658952, at *1 (5th Cir. Feb. 16, 2024). The Fourth Circuit has maintained its prior
position that changes in the law can constitute extraordinary and compelling
reasons for release, but it did not confront the question of whether the Commission
exceeded its authority with § 1B1.13(b)(6). *Davis*, 2024 WL 1662931, at *5, *7 (citing
*McCoy*, 981 F.3d at 287).

argument" that "the court should have amended [the defendant's] 'draconian' sentence because . . . it is disproportionately long compared to the sentences imposed on his co-conspirators." *United States v. Grommet*, No. 23-2082, 2024 WL 676761, *2 (Feb. 20, 2024). In March 2024, the Seventh Circuit recognized in dicta the "exception" to the rule that "compassionate release cannot be used as a substitute for a direct appeal or collateral attack" set forth in § 1B1.13(b)(6), but did not consider the propriety of the subsection, or apply the subsection, because the defendant had not served at least ten years of his sentence so was ineligible to be considered for a reduction under its terms. *United States v. Moore*, No. 23-2919, 2024 WL 890003, at *1 (7th Cir. Mar. 1, 2024).

Here, "[t]here is no doubt that [Defendant] falls within the scope of the amended version of § 1B1.13(b)(6)." *Black*, 2024 WL 449940, at *5. The question for the Court, therefore, "is whether the . . . Commission's or the Seventh Circuit's interpretation of 'extraordinary and [compelling]' prevails." *Id.*

### 5.1.1.3 The Seventh Circuit's Interpretation Prevails

The Government urges the Court to rest its analysis, in large part, on the Supreme Court's holding in *Neal v. United States*, 516 U.S. 285 (1996). ECF No. 2362 at 17. There, the Court held that "the Commission does not have the authority to amend [a] statute" or "to override [a] statute" as courts have previously interpreted it. 516 U.S. at 766, 768; *see also United States v. Koons*, 850 F.3d 973, 979 (8th Cir. 2017), *aff'd*, 584 U.S. 700 (2018) ("Nor can 'the . . . Commission . . . overrule circuit precedent interpreting a *statutory* provision.'") (quoting *United States v. Williams*, 808 F.3d 253, 266 (4th Cir. 2015) (Traxler, C.J., dissenting)). In other words, the Government appears to urge the Court to disregard the agency deference analysis set

Case 2:97-cr-00098-JPS   Filed 05/23/24   Page 32 of 71   Document 2376

forth in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) in light of prior judicial interpretations of the scope of § 3582(c)(1)(A).

However, as the court noted in *Brown*, "the [Supreme] Court in *Neal* was weighing differing interpretations of a mandatory minimum statute for which Congress *had not explicitly delegated interpretative authority to the Commission*." 2024 WL 409062, at *5 (citing *Neal*, 516 U.S. 284) (emphasis added). The same is true with respect to the amendment analyzed in *Koons*. Indeed, there, the district court reviewed multiple statutes to locate "the necessary statutory authority for the . . . Commission's" implementation of its amendment, but it found none and concluded that the Commission's action was taken "*ultra vires*." *United States v. Feauto*, 146 F. Supp. 3d 1022, 1032–37 (N.D. Iowa 2015), *aff'd on other grounds sub nom. Koons*, 850 F.3d 973.

Instead, here, "Congress *did* delegate authority to the Commission to interpret the meaning of the phrase 'extraordinary and compelling.'" *Brown*, 2024 WL 409062, at *5. "And when 'Congress entrusts to the [Commission], rather than to the courts, the primary responsibility for interpreting the statutory terms[,] . . . [a] reviewing court is not free to set aside [that interpretation] simply because it would have interpreted the statute in a different manner.'" *Id.* (quoting *Batterton v. Francis*, 432 U.S. 416, 425 (1977)).

Moreover, the Supreme Court later clarified that "*Neal* established only that a precedent holding a statute to be unambiguous forecloses a contrary agency construction." *Nat'l Cable & Telecoms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 984 (2005); *id.* at 982 ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus

Case 2:97-cr-00098-JPS    Filed 05/23/24    Page 33 of 71    Document 2376

leaves no room for agency discretion.") (citing *Chevron,* 467 U.S. 837). This makes sense because, at step one of the *Chevron* analysis, courts are tasked with analyzing whether a statute is unambiguous. *Chevron,* 467 U.S. at 842–43. It is only when a statute *is* ambiguous, or silent, that the court turns to "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843 (footnote omitted).

In *Thacker,* the Seventh Circuit interpreted § 3582(c)(1)(A),[12] not the then-existing policy statement itself (as contemplated by *Braxton,* 500 U.S. 344). *See Black,* 2024 WL 449940, at *7 ("Seventh Circuit cases have interpreted the statutory language without regard to the content of that policy statement."). This much is clear from the fact that the *Thacker* court incorporated the Seventh Circuit's prior holding in *Gunn,* where the court held that the "district court made the mistake of resting a part of its reasoning on the Sentencing Commission's policy statement" when there was no applicable policy statement and only "the trailing paragraph of § 3582(c)(1)(A)" controlled. 4 F.4th at 572–73 (citing *Gunn,* 980 F.3d at 1179); *Gunn,* 980 F.3d at 1179. Under that trailing paragraph, the Seventh Circuit reasoned that district courts "ha[d] broad discretion," but "discretion[] . . .

---

[12]As explained *supra* Section 5.1.1.2, 28 U.S.C. § 994(t) authorizes the Commission to define those "extraordinary and compelling" circumstances that can serve as a basis for the Court to reduce a defendant's sentence under § 3582(c)(1)(A). In other words, § 944(t), not § 3582(c)(1)(A), is the true enabling statute for the Commission.

The parties' briefing focuses on § 3582(c)(1)(A). Since § 994(t) incorporates § 3582(c)(1)(A) and instructs the Commission to flesh out the meaning of "extraordinary and compelling" in § 3582(c)(1)(A), the Court will presume that the parties meant to refer to both provisions as a unified statutory scheme. *See Black,* 2024 WL 449940, at *8 (first analyzing whether § 994(t) is ambiguous then analyzing "whether the Commission's policy statement [in § 1B1.13(b)(6)] is a reasonable interpretation of the enacted text of § 3582(c)(1)(A)") (citation and internal quotation marks omitted).

Case 2:97-cr-00098-JPS    Filed 05/23/24    Page 34 of 71    Document 2376

[that] only goes so far." *Thacker*, 4 F.4th at 573–74. As earlier explained, discretion could not "effect a sentencing reduction at odds with Congress's express determination," nor could it allow a defendant to "circumvent the normal process for challenging potential sentencing errors, either through the direct appeal process or collaterally through a 28 U.S.C. § 2255 motion." *Id.* at 574; *Williams*, 65 F.4th at 347 (quoting *Brock*, 39 F.4th at 465).

However, the Seventh Circuit did not explicitly hold in *Thacker* or its progeny that § 994(t) and § 3582(c)(1)(A) are unambiguous. Instead, it cabined its holdings such that they apply "until the . . . Commission updates its policy statement" or until "either the Commission or the [Supreme] Court . . . address[es] it." *Thacker*, 4 F.4th at 573; *Williams*, 65 F.4th at 349; *id.* at 346 ("Congress has provided little statutory guidance . . . .") (citing *Peoples*, 41 F.4th at 841 and § 994(t)). These cases thus did not "unambiguously foreclose[] the [Commission's] interpretation" or suggest that § 994(t) and § 3582(c)(1)(A) leave "no gap for the [Commission] to fill." *Brand X*, 545 U.S. at 982–83. Therefore, because Congress expressly delegated authority to the Commission to define "extraordinary and compelling" reasons for release, § 994(t), and because no prior judicial finding of § 994(t)'s or § 3582(c)(1)(A)'s unambiguity exists under this Circuit's precedent, the Government's *Neal* argument is unavailing.

The Court therefore turns to whether the Commission's addition, pursuant to § 994(t), of § 1B1.13(b)(6) to those "extraordinary and compelling" circumstances which can serve as a basis for a sentence reduction under § 3582(c)(1)(A) is valid under *Chevron*, 467 U.S. 837. First, the Court must determine whether the statutory scheme is unambiguous; in other words, "whether the plain meaning of [§ 994(t) and § 3582(c)(1)(A)] either supports or opposes" the Commission's interpretation. *Square D Co.*

& *Subsidiaries v. Comm'r*, 438 F.3d 739, 744 (7th Cir. 2006) (citing *Chevron*, 467 U.S. at 842–43; *Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 983 (7th Cir. 1998); and *Kikalos v. Comm'r*, 190 F.3d 791, 796 (7th Cir. 1999)). Second, if "the plain meaning is either silent or unclear . . . , [the Court] proceed[s] to the second step and evaluate[s] the reasonableness of the Commission[]'s interpretation." *Id.* (citing *Chevron*, 467 U.S. at 842–43; *Bankers Life & Cas. Co.*, 142 F.3d at 983 and *Kikalos*, 190 F.3d at 796); *see also United States v. Santoyo*, 146 F.3d 519, 524–25 (7th Cir. 1998) (analyzing express delegation of authority to Commission and Commission's response under *Chevron*).

Contrary to both Defendant's, ECF No. 2368 at 31, and the Government's, ECF No. 2362 at 17, positions, the Court finds that the statutory scheme of § 994(t) and § 3582(c)(1)(A) is ambiguous because it squarely "left a gap for the [Commission] to fill." *Black*, 2024 WL 449940, at *8 (citing *Brand X*, 545 U.S. at 982–83). Indeed, "[a] statute's grant of definitional authority to an agency decides Step One in the agency's favor because the definitional provision 'confirms that the Congress has not directly spoken' to the interpretive question." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 306 F. Supp. 3d 44, 54 (D.D.C. 2018), *rev'd and remanded on other grounds*, 934 F.3d 649 (D.C. Cir. 2019) (quoting *Lindeen v. SEC*, 825 F.3d 646, 653 (D.C. Cir. 2016)).

Moreover, and in any event, as the Seventh Circuit recognized, "Congress has provided little statutory guidance on how district courts should interpret the term ['extraordinary and compelling']." *Williams*, 65 F.4th at 346. All Congress has directed is that rehabilitation alone is not extraordinary and compelling. *Id.* (citing *Peoples*, 41 F.4th at 841 and § 994(t)). Congress requested that the Commission describe "the criteria to

be applied and a list of specific examples," thus providing "little discernible content" or contextual indication of how the term should be construed. *Black*, 2024 WL 449940, at *8 (first quoting § 994(t); other citations omitted). The term is further not defined in the United States Code. *Id.* (citing *City of Arlington v. F.C.C.*, 569 U.S. 290, 296 (2013) ("Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion."). On balance, "[t]he statutory structure, therefore, suggests that [the statutory scheme of § 994(t) and § 3582(c)(1)(A)] does not have [a] clear meaning" and is ambiguous. *Square D Co.*, 438 F.3d at 745.

Under step two of *Chevron*, where, as here, there is an "express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," "[s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." 467 U.S. at 843–44 & n.12 (collecting cases); *see also Square D Co.*, 438 F.3d at 745 (same); *Santoyo*, 146 F.3d at 524–25 (same). Under this standard, "[w]hen reviewing the agency's explanation, a court must consider 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Am. Bankers Ass'n*, 306 F. Supp. 3d at 55 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 462 U.S. 29, 43 (1983)).

For many reasons, the Court finds that § 1B1.13(b)(6) is manifestly contrary to the statutory scheme of § 994(t) and § 3582(c)(1)(A). "In determining whether [a Commission amendment] accurately reflects Congress'[s] intent, [courts turn, as [they] must, to the statutory language." *United States v. LaBonte*, 520 U.S. 751, 757 (1997). "If the Commission's revised commentary is at odds with [the statute's] plain language, it must

give way." *Id.* (citing *Stinson v. United States*, 508 U.S. 36, 38 (1993)). "[Courts] assume that in drafting . . . legislation, Congress said what it meant." *Id.* Thus, courts begin by "[g]iving the words used their 'ordinary meaning.'" *Id.* (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). In this analysis, "it is the meaning of a statutory term at the time it became law that controls." *Am. Bankers Ass'n*, 306 F. Supp. 3d at 56 (citing *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014) and *Carcieri v. Salazar*, 555 U.S. 379, 388 (2009)). At the time the SRA was enacted, "extraordinary" was understood to mean "most unusual," "far from common," and "having little or no precedent." *United States v. McCall*, 56 F.4th 1048, 1055 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 2506 (2023) (quoting *Extraordinary, Webster's Third New International Dictionary* 807 (1971)). "Compelling" was understood to mean "forcing, impelling, driving." *Id.* (quoting *Compelling, Webster's Third New International Dictionary* 463 (1971)).

It is canonical that "federal court[s] generally 'may not modify a term of imprisonment once it has been imposed.'" *Dillon v. United States*, 560 U.S. 817, 819 (2010) (quoting § 3582(c)). Congress gave the principle of finality "statutory weight" in § 3582(b), *McCall*, 56 F.4th at 1055, which provides that—save few exceptions—"a judgment of conviction . . . constitutes a final judgment." Equally paramount, "[f]ederal sentencing law presumes that changes in sentencing law are not retroactive." *Id.* (citing *United States v. McKinnie*, 24 F.4th 583, 587 (6th Cir. 2022)). "[O]rdinary practice is to apply new penalties to defendants not yet sentenced, while withholding that change from defendants already sentenced." *Dorsey v. United States*, 567 U.S. 260, 280 (2012). "This ordinary practice reflects a 'presumption against retroactive legislation' that is 'deeply rooted in our jurisprudence' and that 'embodies a legal doctrine centuries older than our Republic.'" *McMaryion*,

2023 WL 4118015, at *2 (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994)). It follows, as the Sixth Circuit has held, that what is "ordinary" cannot also be extraordinary. *McCall*, 56 F.4th at 1055 (citing *United States v. Wills*, 997 F.3d 685, 688 (6th Cir. 2021)). Unless Congress "expressly says so," the "ordinary" practice applies and changes in sentencing law apply only prospectively. *Id.* (citing *Dorsey*, 567 U.S. at 280).

In the case of § 1B1.13(b)(6), simply put, Congress did not "say so" in § 994(t) or § 3582(c)(1)(A). The "ordinary" principles of nonretroactivity implicitly already allow for Congress's—or the judiciary's as to judicial decisions of constitutional law—consideration of whether a change in the law should be allowed to disturb final convictions. *See United States v. Wiltberger*, 18 U.S. 76 (1820) ("It is the legislature . . . which is to define a crime, and ordain its punishment."); *Covey v. United States*, 109 F. Supp. 2d 1135, 1140–41 (D.S.D. 2000) ("So long as it is not contrary to the Constitution, Congress can make legislation retroactive. *There is no statutory retroactivity unless it is specifically indicated* . . . . The federal courts do not have the same latitude, except for the retroactivity exception doctrines now in existence on constitutional issues.") (citing *Lindh v. Murphy*, 521 U.S. 320, 326–27 (1997) (emphasis added)). The Court must therefore conclude that "the Commission's [addition of § 1B1.13(b)(6)] is at odds with [the statutory scheme's] plain language" and with what Congress "said . . . it meant." *LaBonte*, 520 U.S. at 757 (citation omitted).

The structures of § 994 and § 3582(c) reinforce the conclusion that Congress did not intend for the Commission to make changes in sentencing law retroactive without Congressional approval. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the

remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.") (collecting cases).

In § 994, Congress shows that it knows how to permit the Commission to give an amendment to sentencing law retroactive effect, but it did not do so in § 994(t). *See* 28 U.S.C. § 994(u) ("If the Commission reduces the term of imprisonment recommended in the guidelines applicable to a particular offense or category of offenses, it shall specify in what circumstances and by what amount the sentences of prisoners serving terms of imprisonment for the offense may be reduced."); *see also LaBonte*, 520 U.S. at 755 ("Pursuant to its authority under 28 U.S.C. § 994(u), the Commission opted to give Amendment 506 [to a guideline] retroactive effect."); *Braxton*, 500 U.S. at 348 (same). Nor does § 994(u) apply to potentially authorize retroactivity in the case of § 1B1.13, which is a policy statement—not a guideline. *See* 28 U.S.C. § 994(a)(1)–(2) (distinguishing between guidelines and policy statements). Indeed, only changes to the guidelines themselves, not policy statements like § 1B1.13, must be submitted for congressional review, which further evinces Congress's intent to give itself—not the Commission through policy statements—the power to review retroactivity. *See* 28 U.S.C. § 994(p).

Nonetheless, pursuant to its Congressionally-delegated authority under § 994(t), the Commission added subsection (b)(6) to its policy statement defining "extraordinary and compelling circumstances," which, even if not in text, in *practice* has the effect of allowing a nonretroactive or intervening change in the law to have retroactive effect. The Court is not saying that "a court could never reduce [a] sentence for any extraordinary and compelling circumstances" absent retroactivity, *United States v.*

*Skeeters*, No. 05-530-1, 2024 WL 992171, at *6 (N.D. Pa. Mar. 7, 2024), but rather that retroactivity should not be imported into a body of law for which it is not authorized. Extraordinary and compelling circumstances, such as terminal illness, allow for such a reduction without the effect of backdoor retroactivity.

Any argument that Congress affirmatively endorsed the Commission making subsection (b)(6) retroactively applicable is illusory. While the Commission submitted the amendments to the policy statement in § 1B1.13 to Congress, this was not required under the statutory scheme of § 994. *See* 28 U.S.C. § 994(p). And, while "Congress allowed these amendments to go into effect without modification," courts must "resist reading congressional intent into congressional inaction." *Carter*, 2024 WL 136777, at *7 (quoting *Kimbrough v. United States*, 552 U.S. 85, 106 (2007)). For the same reason, the Court finds unpersuasive the Eastern District of Pennsylvania's reasoning in *Skeeters*: that "Congress was well aware of but made no mention of 18 U.S.C. § 3582(c)(1)(A)(i) or 28 U.S.C. § 994(t) in relation to the nonretroactive provision of the First Step Act." 2024 WL 992171, at *6 (citing *McCoy*, 981 F.3d at 286–87).

With respect to the structure of § 3582(c), in the paragraph immediately following § 3582(c)(1), Congress expressly addressed retroactive changes in the law. 18 U.S.C. § 3582(c)(2) ("[I]n the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the . . . Commission pursuant to 28 U.S.C. [§] 994(o), . . . the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) . . . ."). Again, Congress knows how to permit the Commission to give an amendment to sentencing law retroactive effect, but it did not do so

in § 994(t). *See* 28 U.S.C. § 994(o), (u). Thus, "[v]iewed as a whole, the body of law makes one thing clear: When Congress wants a change in sentencing law to have retroactive effect, it explicitly says so." *McCall*, 56 F.4th at 1056. If § 3582(c)(1)(A) "already covered all legal developments, retroactive or not," there would be no reason to include § 3582(c)(2). *Id.* Additionally, with § 3582(c)(1)(A)(ii), Congress has explicitly provided a mechanism for some defendants (those convicted under 18 U.S.C. § 3559(c)) serving long sentences—"at least 30 years"—to seek compassionate release without needing to establish extraordinary and compelling reasons. Allowing an unusually long sentence to be extraordinary and compelling for all defendants would render this provision superfluous.

The exhaustion requirement to which motions under § 3582(c) are subject also reinforces this conclusion. Although the First Step Act changed § 3582(c) such that a defendant could directly move the court for compassionate release, § 3582(c)(1)(A) retains some level of BOP involvement in the process. Prior to moving the court, a defendant must "exhaust[] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" after the defendant makes such a request to the warden of his facility. 18 U.S.C. § 3582(c)(1)(A).

In the Seventh Circuit, compassionate release follows an "issue exhaustion" requirement, which means that "an inmate cannot satisfactorily exhaust . . . by filing a grievance [with his warden] on one ground and then [filing] in court on an unrelated ground." *United States v. Williams*, 987 F.3d 700, 704 (7th Cir. 2021) (citing *Woodford v. Ngo*, 548 U.S. 81, 93 (2006), 42 U.S.C. § 1997e(a), and *Schillinger v. Kiley*, 954 F.3d 900, 995–96 (7th Cir. 2020)). The BOP must be able to "determine whether it should

bring a compassionate-release motion" based on the specific grounds presented by the defendant. *Id.* at 703.

A scheme in which the BOP is required to assess (1) under which change in the law a defendant purports to move, (2) whether the defendant's sentence is unusually long, and (3) compare the defendant's sentence to similarly situated defendants for signals of a gross disparity is unworkable. Although the Fourth Circuit does not require issue exhaustion, it recognized that "[t]he compassionate release process at the BOP level is non-adversarial, and the BOP is not adjudicating the merits of the inmate's request for compassionate release but rather determining whether to use government resources to ask for compassionate release on the inmate's behalf." *United States v. Ferguson*, 55 F.4th 262, 269 (4th Cir. 2022), *cert. denied*, No. 22-1216, 2024 WL 759802 (U.S. Feb. 26, 2024). The addition of § 1B1.13(b)(6) is untenable and inconsistent with the nature of the exhaustion requirement.

Additionally, throughout the structure of the First Step Act as a whole, Congress took care to "delineate[] between retroactive and nonretroactive changes," and it would bely that congressional design to interpret § 3582(c)(1)(A) as "unscrambl[ing] that approach." *McCall*, 56 F.4th at 1057 (quoting *United States v. Jarvis*, 999 F.3d 442, 443–44 (6th Cir. 2021)). Section 1B1.13(b)(6) would allow even those changes in the law that Congress explicitly chose not to make retroactive to apply, in practice, retroactively. At the same time, curiously, the Commission *excludes* from § 1B1.13(b)(6) "amendment[s] to the Guidelines Manual that ha[ve] not been made retroactive," thus affording its own choices more deference than Congress's or the courts' choices.

Case 2:97-cr-00098-JPS   Filed 05/23/24   Page 43 of 71   Document 2376

It is true, as Defendant notes, ECF No. 2368 at 26, that in *Brown*, the Southern District of Ohio found that § 1B1.13(b)(6) controlled over *McCall*, where the Sixth Circuit laid out many of the textual and structural anomalies with allowing a nonretroactive or intervening change in the law to be "extraordinary and compelling." 2024 WL 409062, at *6. But there, the district court found persuasive that § 1B1.13(b)(6) "respond[ed] to the concerns motivating *McCall* by creating a narrow exception to a general bar on consideration of nonretroactive changes elsewhere in the policy statement." *Id.* (citing § 1B1.13(c)). Under § 1B1.13(c), other than as set forth in § 1B1.13(b)(6), a change in the law "shall not be considered for purposes of determining whether an extraordinary and compelling reason exists," though it may be considered in determining the extent of any such otherwise warranted reduction.

Respectfully, the Court disagrees that this limitation alters the careful congressional scheme of explicitly authorizing retroactivity elsewhere in the statute. And, more importantly, it does not resolve the Seventh Circuit's principal concern, which was to avoid tension with the "path and conditions Congress established for federal prisoners to challenge their sentences" under 28 U.S.C. § 2255 or the direct appeal process. *Thacker*, F.4th at 574; *Williams*, 65 F.4th at 347 (quoting *Brock*, 39 F.4th at 465). The Commission's addition of the qualifiers of gross disparity and that the defendant have served at least 10 years of his sentence also do not change the calculus in the absence of explicit authorization of retroactivity.

It would wholly frustrate this scheme, including the bar on second or successive motions under § 2255(h), if a defendant "could evade this

requirement by the simple expedient of putting a different label on [his] pleadings." *Preiser v. Rodriguez*, 411 U.S. 475, 489–90 (1973). Indeed,

> because collateral review significantly undermines the government's important interest in finality, Congress and the Supreme Court have established many procedural rules limiting the availability of such relief, including for errors made clear by intervening judicial decisions. They have also established many exceptions to these limitations, reflecting a careful balance between the government's interest in finality and the defendant's interest in obtaining relief from an unlawful sentence.

*Jenkins*, 50 F.4th at 1201 (collecting cases). "[I]f Congress intended the compassionate-release statute to act as an exception to this post-conviction framework, 'it would have made that intent specific.'" *McCall*, 56 F.4th at 1058 (quoting *McKinnie*, 24 F.4th at 588) (internal quotation marks omitted).

In addition to the statutory text and structure, Congressional intent behind the SRA also shows that the addition of § 1B1.13(b)(6) is manifestly contrary to the statutory scheme of § 994(t) and § 3582(c)(1)(A). *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms."). The Senate Report on the SRA demonstrates that the purpose of the SRA was to remedy "the great variation among sentences imposed by different judges upon similarly situated offenders" and "the uncertainty as to the time the offender would spend in prison." *Mistretta v. United States*, 488 U.S. 361, 366 (1989) (citing S. Rep. No. 98-225, at 38, 47, 65); S. Rep. No. 98-225, at 38 (seeking to remedy "each judge [being] left to apply his own notions of the purposes of sentencing").

The SRA thus, in many ways, sought to limit judicial discretion to modify allegedly illegal sentences. For example, the SRA enacted

§ 3582(c)(1)(B), which allows district courts to modify sentences under Federal Rule of Criminal Procedure 35, but "[a]t the same time, . . . substantially narrowed" the scope of Rule 35. *Jenkins*, 50 F.4th at 1201. Before the SRA was enacted, courts could correct an illegal sentence at any time under Rule 35; now, courts may only do so within 14 days of sentencing to correct clerical errors, on remand from a court of appeals, or to reflect a defendant's substantial assistance. *Id.*; Fed. R. Crim P. 35.

Similarly, the Senate Report makes clear that § 3582(c) was meant to be narrow. The Committee described "unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances." S. Rep. No. 98-225, at 55. "These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term of imprisonment." *Id.* at 55–56. This was contemplated to be a "relatively small number of cases," *id.* at 56, or a "'safety valve' . . . regardless of the length of sentence, to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner," *id.* at 121.

It is the Court's view that, in this context, the Commission's belief that the Senate Report supports § 1B1.13(b)(6) is incorrect. 88 Fed. Reg. at 28258–59. First, judges applying § 1B1.13(b)(6) would "have widely divergent views" about when a sentence is "unusually long" as well as when a nonretroactive or intervening change in the law produces a "gross disparity." *Jenkins*, 50 F.4th at 1202. Certainly the "SRA—which effected a

profound shift from indeterminate to determinate sentencing—" should not be read to "contain[] the seeds of its own destruction." *Id.*

Second, the narrow language describing § 3582(c) does not support that an unusually long sentence alone is extraordinary and compelling; rather, it indicates that a separate extraordinary and compelling circumstance may justify reduction of an unusually long sentence. The language regarding "unusually long sentences" is further set off from the language regarding retroactivity, similar to the separation of § 3582(c)(1)(A) and § 3582(c)(2). These provisions do not indicate that principles of retroactivity may be applied to an "unusually long sentence" simply because a defendant has served some amount of time already, the law has changed, and a sentence imposed today would be shorter. *See United States v. Crandall*, 25 F.4th 582, 586 (8th Cir.), *cert. denied*, 142 S. Ct. 2781, 213 L. Ed. 2d 1018 (2022) ("The views of . . . a present-day sentencing judge, about the appropriate punishment for a present-day offense do not establish an 'extraordinary and compelling reason' for reducing a sentence imposed years ago.").

The First Step Act did not change the "substance" of the SRA, as it focused only on process. *King*, 40 F.4th at 596 ("The First Step Act did not create or modify the 'extraordinary and compelling reasons' threshold for eligibility; it just added prisoners to the list of persons who may file motions."). "And because Congress left the substance of the 'extraordinary and compelling reasons' requirement intact, [courts should] assume the phrase retained 'the meaning it had under the previous version of the statute.'" *McCall*, 56 F.4th at 1060 (quoting *Andrews*, 12 F.4th at 260 and citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 322 (2012) ("The clearest application of the

Case 2:97-cr-00098-JPS   Filed 05/23/24   Page 47 of 71   Document 2376

prior-construction canon occurs with reenactments: If a word or phrase . . . has been given a uniform interpretation by inferior courts or the responsible agency, a later version of that act perpetuating the wording is presumed to carry forward that interpretation.")). Further, and again, Congress specifically delineated between retroactive and nonretroactive applications throughout the First Step Act, but it did not "change th[e] substantive status quo" as to § 3582(c)(1)(A). *Id.*; *see also Crandall*, 25 F.4th at 586 ("The legislative action in 2018 is comparable to the decision of a sentencing judge in 2018 to impose a lesser sentence than a predecessor imposed in 1990 for the same offense. Neither circumstance is a sufficient ground to support a reduction of a previously imposed sentence under § 3582(c)(1)(A).").

Thus, for all these reasons, the Court finds that § 1B1.13(b)(6) is manifestly contrary to the statutory scheme set forth in § 994(t) and § 3582(c)(1)(A), and that the Commission exceeded its statutory authority by adding the subsection. Setting aside § 1B1.13(b)(6), the Court is left with *Thacker*, 4 F. 4th 569 and its progeny, by which the Court is bound. *Black*, 2024 WL 449940, at *11. Applying these precedents, the substantial length of Defendant's imprisonment, together with the Supreme Court's intervening decision in *Booker*, 543 U.S. 220, and the "gross disparity" between the sentence imposed and the sentence that Defendant may receive today, is not an extraordinary and compelling basis for release.

### 5.1.2 Remaining Bases for Release: Sentence Disparity with Co-Defendant; Age and Age-Related and Institutional-Related Deterioration in Health; and the Government's "Pretextual Lies" and "Disinformation" and Errors in PSR

Defendant presents his sentence disparity with his co-defendant under § 1B1.13(b)(5)'s "catchall" provision, contending that it has produced

"circumstance[s] of comparable gravity" to those otherwise delineated by the Commission. ECF No. 2356 at 27. The Seventh Circuit has previously held that a compassionate release motion seeking "a modification of [a] prison sentenced based on [the] argument that the disparity between [a] defendant's sentence and his co-defendant's [i]s unwarranted" is "a challenge to a length of the prison sentence" appropriately heard on direct appeal or in a § 2255 motion, not on compassionate release. *United States v. Arojojoye*, 806 F. App'x 475, 478 (7th Cir. 2020). Defendant refers to this language as "dicta." ECF No. 2368 at 20. The Court disagrees. While the Seventh Circuit did not reach the issue of whether this argument may be "extraordinary and compelling" as "contemplated by the First Step Act and the applicable policy statements of the . . . Commission," it plainly held that the district court "correctly construed [the] request as an unauthorized successive § 2255 motion." *Arojojoye*, 806 F. App'x at 478. This holding alone forecloses Defendant's argument that, in this Circuit, alleged sentencing disparities fit within § 1B1.13(b)(5).

However, even setting aside *Arojojoye* and considering the argument on its merits, Defendant's circumstances are not extraordinary and compelling. Defendant points, ECF No. 2368 at 20–23, to several cases where the defendants' prosecutions and convictions involved the former ATF practice of "engaging in sting operations where undercover agents provided individuals with the opportunity to rob drug stash houses that did not exist." *United States v. Conley*, No. 11 CR 0779-6, 2021 WL 825669, at *1 (N.D. Ill. Mar. 4, 2021); *United States v. Logan*, No. 07 CR 270-2, 2023 WL 2771165 (Apr. 4, 2023); *United States v. Spagnola*, No. 07 CR 441-2, 2023 WL 5004396 (N.D. Ill. June 22, 2023). The fake stash house stings later ceased after wide condemnation, prosecutors dismissed many cases related to fake

stash house sings, and the U.S. Attorney's Office in the Northern District of Illinois stopped prosecuting these cases. *Logan*, 2023 WL 2771165, at *2.

The *Conley* and *Logan* courts' decisions that the defendants' sentences were disproportionate from those of defendants who pleaded guilty was driven by the "inherent unfairness and injustice" of fake stash house stings, which "tied . . . the Court's hands" as to sentencing guidelines based on the amount of drugs "the government arbitrarily decided was in the fake stash house." *Conley*, 2021 WL 825669, at *4; *Logan*, 2023 WL 2771165, at *4 (finding disparity related to the defendant's "continued incarceration for crimes that the government later deliberately ceased to prosecute"); *Spagnola*, 2023 WL 5004396, at *3 ("The context of [the defendant's] conviction prior to the government's discontinuation of stash house operations is what warrants compassionate release.").

Although Defendant continues to protest the circumstances of the charges in his case, *see supra* note 2, the fake stash house stings described in these three cases in which compassionate release was granted—which again involved active recruitment of defendants by undercover agents—are a far cry from Defendant's voluntary and unaided participation in his crimes. Defendant was actively involved in his crimes; indeed, Defendant received a two-level increase under U.S.S.G. § 3B1.1(c) for his leadership role, PSR at 34, and was considered the organizer and leader of much of the Outlaws' unlawful activity, including the murder of Donald Wagner charged in racketeering Act 2, *id.* at 1, 34.

For this reason, the non-"fake stash house sting" cases that Defendant points to are also distinguishable. ECF No. 2368 at 22 (citing *United States v. Ward*, No. 09 CR 687-3, 2023 WL 5004408, at *2 (N.D. Ill. June 22, 2023) ("Several federal courts, including this one, have considered

sentencing disparities both within and outside of the stash house context when granting compassionate release.") (collecting cases). For example, in *Liscano*, cited in *Ward*, the court was persuaded to consider a disparity as extraordinary and compelling when the defendant "was among the least culpable members" of the charged conspiracy. 2021 WL 4413320, at *7. Defendant also cites, ECF No. 2356 at 35–36, two cases where, again, the defendant who had been "charged with and convicted of a substantially *smaller* amount of charges" received disparity consideration. *United States v. Ferguson*, 536 F. Supp. 3d 139, 143 (E.D. Mich. Apr. 29, 2021) (emphasis added); *United States v. Sparkman*, No. 09-cr-0332-07, 2020 WL 6781793, at *9 (N.D. Ill. Nov. 18, 2020) (disparity found because the defendant "received the same sentence as . . . the criminal mastermind"). That is simply not the case here. Further, *McCoy*, also cited in *Ward*, is *legally* distinguishable on the basis that, contrary to the Court's findings above and Seventh Circuit precedent, the court found that changes in the law that produce disparities are extraordinary and compelling. 981 F.3d at 281.

While the co-defendant's plea agreement also indicates that he had a leadership role in the Outlaws, *see, e.g.*, ECF No. 2170 at 2, there is no indication from the charges attributed to both Defendant and the co-defendant, or the evidence adduced against Defendant at trial, that he was less culpable than the co-defendant. Defendant asserts in the instant compassionate release proceedings that he was also extended a plea offer, but he chose not to take it and to go to trial. ECF No. 2285 at 20–22. There is nothing extraordinary or compelling about the subsequent difference in sentences imposed upon Defendant and his co-defendant under these circumstances. Defendant further takes issue with his co-defendant's absence at his trial, as well as his co-defendant's easier conditions of

confinement. As to the former, this is an argument appropriate for direct appeal, not compassionate release, and as to the latter, sealed filings on the docket indicate that the co-defendant suffered from a heart condition at the time of sentencing, which may have affected his BOP placement. *See Williams*, 65 F.4th at 347 (quoting *Brock*, 39 F.4th at 465); *see also* ECF No. 2167. Matters of BOP inmate classification are within the BOP's, not the Court's, province.

Next, Defendant raises his age and medical conditions under § 1B1.13(b)(2), ECF No. 2356 at 7, and his institutional conditions under § 1B1.13(b)(5), *id.* at 21. The Court also considers Defendant's medical conditions under § 1B1.13(b)(1)(B) and (C), and it also considers Defendant's allegations regarding his physical attacks under § 1B1.13(b)(4)(B).

With respect to the attacks, under § 1B1.13(b)(4)(B), physical abuse directed by a BOP employee—as Defendant alleges here—is an extraordinary and compelling basis for compassionate release. However, such misconduct must be established by "a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger." § 1B1.13(b)(4)(B). Defendant has moved in connection with his compassionate release proceedings to compel the BOP to disclose surveillance video of the attacks, ECF No. 2317, and he has also submitted correspondence that he sent to the United States Attorney's Office seeking the video surveillance and 27 pages of documents in the administrative file that are being withheld from him, ECF No. 2368-1 at 4 and ECF No. 2285-1 at 60. He suggests that he cannot offer the proof required under § 1B1.13(b)(4)(B) absent this evidence. ECF No. 2368 at 9.

Defendant does not cite any authority permitting discovery in connection with compassionate release proceedings. The Court's research has not turned up any authority. For example, even litigants under § 2255 are "not entitled to discovery as a matter of course," and litigants in compassionate release proceedings are "even further removed" from that scenario. *United States v. Nesbit*, No. 3L15-cr-52, 2022 WL 15522990, at *3–4 (N.D. Ohio) (quoting *United States v. Atkin*, 80 F. Supp. 2d 779, 785 (N.D. Ohio 2000)); *cf. United States v. Edwards*, No. 3:14-CR-30173-NJR-3, 2019 WL 5555559, at *2 (S.D. Ill. Oct. 28, 2019) ("[The defendant] cites to no statute or other authority that would require the Court or the Government to turn over such evidence *after* he has pleaded guilty, been sentenced, and his appeal denied [in his criminal case]."). The cases that Defendant cites to support his discovery request were filed as civil cases under 28 U.S.C. § 2241 or the Freedom of Information Act and are thus inapposite. ECF No. 2368 at 11–12 (citing *Smith v. True*, No. 18-cv-1158-NJR, 2020 WL 5370054 (S.D. Ill. Sept. 8, 2020) and *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578 (D.C. Cir. 2020)).[13]

The lack of authority in this area makes sense because arguments regarding prison conditions generally must be litigated under 42 U.S.C. § 1983, where discovery is authorized under the Federal Rules of Civil Procedure. *See, e.g., United States v. Scott*, 850 F. App'x 449, 452 (7th Cir. 2021). However, conditions at an institution may be raised on compassionate release where the defendant "connect[s] [them] to his

---

[13]To the extent Defendant suggests that the video surveillance is relevant to the Court's consideration of the § 3553(a) factors or for resentencing purposes, the Court concludes in this Section that Defendant has not established an extraordinary and compelling basis for release and proceeds to consider the § 3553(a) factors only in the alternative. ECF No. 2368 at 12 (citing *Koon v. United States*, 518 U.S. 81, 112 (1996)). Thus, the argument is unavailing.

specific circumstances." *United States v. Quinones-Quinones*, No. 20-CR-30-1-JPS, 2023 WL 6201464, at *3 (E.D. Wis. Sept. 22, 2023) (quoting *United States v. Newton*, 996 F.3d 485, 491 (7th Cir. 2021)); *but see United States v. Cockerell*, No. 4:15-cr-00028, 2024 WL 1741751, at *3 (S.D. Ind. Apr. 22, 2024) ("Allegations that the BOP has failed to provide protection from COVID-19 and subjected him to inadequate conditions thereby violating [the inmate's] constitutional rights might form the basis for relief in a civil suit, but such allegations are not grounds for a sentence reduction under § 3582(c)(1)(A).") (citing *United States v. Miller*, No. 21-1600, 2022 WL 2187555, at *1 (7th Cir. June 16, 2022)).

Defendant has certainly connected most of his institutional concerns to his specific circumstances, and thus the Court will consider his arguments. However, the Court finds no authority for the proposition that it may compel the BOP to produce records in connection with compassionate release proceedings, and it will therefore deny Defendant's motion to compel. ECF No. 2317. Without proof of a finding of misconduct by one of the bodies set forth in § 1B1.13(b)(4), Defendant's attacks do not rise to the level of extraordinary and compelling under that subsection.

The Court, nonetheless, will consider the attacks under § 1B1.13(b)(5), and in combination with Defendant's arguments regarding his age, other institutional concerns, and medical conditions. Under § 1B1.13(b)(2), Defendant meets subsections (A) and (C). Specifically, he is at least 65 years old and he has served at least 10 years of his sentence. However, under subpart (B) of that subsection, and under § 1B1.13(b)(1)(B) and (C), he has not established that he is suffering from a serious physical or medical condition, deteriorating physical or mental health because of the

aging process, or a medical condition that requires long-term or specialized medical care that is not being provided.

Defendant cites dozens of cases across over 150 pages of briefing where courts have found medical and institutional conditions similar to his extraordinary and compelling. *See generally* ECF Nos. 2285, 2356, 2368; ECF No. 2356-1 at 45–60, 62–67. But for as many cases as there are supporting Defendant's position, there are just as many holding that similar—and worse—medical and institutional conditions are not extraordinary and compelling. *See, e.g., United States v. Bright*, No. CR 2000-0004, 2020 WL 4495271, at *3 (D.V.I. Aug. 4, 2020) (cerebral artery stroke and hemorrhagic stroke not extraordinary and compelling because not terminal or deteriorating); *United States v. Brinson*, No. CR 15-87, 2020 WL 4736258, at *3 (W.D. Pa. Aug. 14, 2020) (paralysis and missing portion of lung not extraordinary and compelling because appropriate treatment has been administered and the defendant had no current resulting health issues); *United States v. Savage*, No. 1:01-CR-64, 2024 WL 1913166, at *1 (N.D. W. Va. Apr. 30, 2024) (brain injury requiring craniotomy from being "stabbed, beaten, and thrown from the second-floor tier of the federal housing unit," followed by subsequent attack nine years later, not extraordinary and compelling where the conditions "are not terminal" and the institution "is providing adequate care").

The Court thus largely makes its determination based on a review of the objective record before it: Defendant's most recent medical records, which provide telling context for his concerns about the attacks, medical conditions, and other institutional issues. ECF Nos. 2362-1, 2362-2. August 2023 records indicate that Defendant's BCC was removed from his face in approximately June 2023. ECF No. 2362-1 at 5. The lesion that was removed

was determined to be "actinic keratosis," not BCC, though it was deemed pre-cancerous. *Id.* at 5, 87, 89. In August 2023, health services ordered a dermatology consultation for another lesion that had grown on Defendant's left cheek that Defendant also believed was BCC. *Id.* at 7. "Presumably, if [Defendant's] doctors had found . . . cancer in the past year, or prescribed a course of radiation or chemotherapy, [he] would have alerted the Court." *United States v. Coletti*, No. 1:14-CR-00326-2, 2021 WL 5833999, at *5 (N.D. Ill. Dec. 9, 2021) (follow-up monitoring by dermatologist is "modest level of follow-up care that the BOP should be able to provide").

In September 2023, when Defendant raised complaints related to his left Achilles rupture in 2000, his request for soft shoes was granted. ECF No. 2362-1 at 4. Defendant has frequently raised knee pain to health services, but he had a normal x-ray in May 2023. *Id.* at 5, 9, 92. He requested an MRI on his knee in August 2023, which he was given in December 2023. *Id.* at 1, 7. Defendant has reported cholesterol issues, but they are treated with medication. *Id.* at 13; ECF No. 2362-2 at 8, 19. He has had several appointments where he did not report blurred vision, headaches, coughing, neck problems, or an abnormal gait. ECF No. 2361-1 at 13, 14, 30, 36. Other records list dizziness and headaches as conditions in "[r]emission." *Id.* at 41. At one point, Defendant reported daily headaches, but noted that medication was "helping his headaches," despite his "noncompliant pill line attendance." ECF No. 2362-2 at 8. Health services counseled Defendant that his medication could be discontinued if he had "subsequent reports . . . of . . . lack of pill line attendance." *Id.* Defendant later requested to stop his medication because he did not want to go to the pill line during "si[]ck months." *Id.* at 1. In June 2022, Defendant reported with intermittent but intense headaches and vertigo, but noted that the vertigo had resolved. ECF

No. 2362-2 at 19. He also attributed a bout of vertigo from January 2022 partially to having had COVID-19 at the time. *Id.* at 20. Defendant received a nuclear stress test in September 2021, which showed normal findings. *Id.*

Older records within the subset produced to the Court indicate that, as Defendant pleads, he has suffered from knee pain, dizziness, and face, scalp, and neck contusions around the times that he was attacked, and that he suffered a left inguinal hernia in 2007 from coughing. ECF No. 2361-1 at 57–58; ECF No. 2362-2 at 55–59; ECF No. 2285-1 at 52–56, 77–86. The Court has further reviewed the record of Defendant's March 2023 visit with the physician assistant, where he contends that he was diagnosed with BCC and informed that he had crushed vertebrae in his neck. The record confirms that the physician assistant did indeed state at that time that Defendant had BCC, ECF No. 2362-1 at 23, however, there are no notes about crushed vertebrae, *id.* at 22–24. The physician assistant noted a history of subarachnoid hemorrhage from the attack in 2012 and "balance concerns," but wrote that it was "[r]esolved [in] 2012." *Id.* at 23.

The Court does not doubt the severity of the attacks or Defendant's pain from the attacks. However, Defendant's medical records demonstrate that Defendant does not often report ongoing symptoms from the attacks and, when he does, he is administered tests and/or treatments. Defendant received medication that he reported aided his headaches, but his own nonattendance at the pill line affected his receipt of that medication. While Defendant complains that the BOP delays his treatments, the BOP cannot delay administering treatment for a condition that has not been reported to it, nor can it be faulted for administering treatment that Defendant does not accept. From the record before the Court, the BOP is capable of—and does—manage any ongoing *reported* symptoms from the attacks. *See United*

*States v. Lee*, No. 21-CR-00070-DMS-1, 2023 WL 7137350, at \*2 (S.D. Cal. Oct. 30, 2023) (holding, in response to contention that "short staffing" has caused failure to properly treat medical conditions, that "[u]pon reviewing the Defendant's lengthy medical records submitted by the government, the Court finds that Defendant is being treated for his condition"). And Defendant's non-attack related medical conditions, as he reports them to the BOP, are neither serious, deteriorating, nor being left untreated.

Nor has the COVID-19 pandemic contributed to Defendant's medical and institutional concerns such that he is unable to provide self-care or protect himself from illness. It is true that the outbreak of COVID-19, together with underlying medical conditions that place a defendant at "high risk" should he contract the disease, may establish an extraordinary and compelling reason warranting release. *See, e.g.*, *United States v. Gonzales*, No. 13-CR-101-JPS, 2020 WL 4437154, at \*4 (E.D. Wis. Aug. 3, 2020). Still though, the Seventh Circuit has instructed district courts to take a deeper dive. *See United States v. Rucker*, 27 F.4th 560, 563 (7th Cir. 2022) (explaining that vaccination is not per se a reason to deny compassionate release on the basis of COVID-19, particularly given recent Omicron variant that has increased "breakthrough infections among the fully vaccinated").

An individualized look at Defendant's case instructs that compassionate release is not appropriate on this basis. Defendant has contracted COVID-19 at least three times—and possibly one additional time—including after being vaccinated. Thus, he appears to be susceptible to breakthrough infections. However, Defendant's medical records and self-reported lack of symptoms indicate that even having suffered a breakthrough infection did not place him "at serious risk" of complication from COVID-19. *United States v. Moran*, No. 3:14-CR-30 JD, 2023 WL

3033447, at *2 (N.D. Ind. Apr. 21, 2023). Further, the World Health Organization has declared that the COVID-19 pandemic is now over,[14] and there are currently no active inmate cases of COVID-19 at FCI Pekin, where Defendant is housed.[15]

Defendant raises inadequate vaccination rates by BOP staff, poor quarantine protocols, and the higher risk of contracting COVID-19 in the prison setting. However, unlike many of his institutional concerns, he does not connect these issues to "his situation [in a manner to show that it is] extraordinary as compared to other inmates," particularly given that he has not suffered serious complications from breakthrough infections. *Cockrell*, 2024 WL 1741751, at *3 (citing *United States v. Khelifi*, No. 21-3144, 2022 WL 3925623, at *1 (7th Cir. Aug. 31, 2022) (finding no extraordinary and compelling circumstances where prisoner did not provide individualized evidence for his argument that his prison mishandled the risks of the pandemic)).

Defendant contends that his sentence disparity with his co-defendant, substantial term of imprisonment, and medical and institutional conditions are made worse in combination with BOP staffing shortages, repeated institutional transfers, security concerns, and disinformation stemming from the media and his PSR. However, none of these additional factors push Defendant's arguments over the edge. In other words, even a review of the combination of all these factors does not render Defendant's circumstances extraordinary and compelling. First, many courts have

---

[14] Smitha Mundasad, et al., *Covid Global Health Emergency Is Over, WHO Says* (May 5, 2023), *available at* https://perma.cc/G93Z-XR4P (last visited May 23, 2024).

[15] Federal Bureau of Prisons, *Inmate COVID-19 Data*, *available at* https://perma.cc/5DST-AJMZ (last visited May 23, 2024).

found that safety or security fears—including of attack—are not extraordinary and compelling bases for release. *See Savage*, 2024 WL 1913166, at *4 (collecting cases).

Second, a lack of adequate staffing, even if that heightens an individual defendant's fear of being attacked or affects his ability to quarantine if he contracts a disease, is not "similar in gravity" to the other extraordinary and compelling reasons enunciated in § 1B1.13, particularly where, as here, Defendant has not offered the required proof of BOP involvement in his attacks. *See* § 1B1.13(b)(5); *United States v. Feliz*, No. 16 CR. 809 (VM), 2023 WL 8275897, at *6 (S.D.N.Y. Nov. 30, 2023) ("The extraordinary and compelling reasons listed in the Policy Statement speak of terminal illnesses, serious and chronic medical conditions, serious deterioration in physical or mental health due to aging, death or incapacitation of immediate family members, and sexual abuse or serious bodily injury committed by the BOP or its agents . . . [Defendant] has not established that alleged staffing shortages or other harsh conditions at FCI Ray Brook are 'similar in gravity' to such circumstances." (citing § 1B1.13)). The same is true for repeated institutional transfers, particularly where the transfers are due to a facility's security level changing. Again, the Court has no control over BOP placements, but routine prison operations are not extraordinary and compelling. *See McCall*, 56 F.4th at 1055 (citing *Wills*, 997 F.3d at 688 (what is "ordinary" cannot also be "extraordinary")).

Third, and finally, the Court turns to Defendant's assertions regarding the Government's alleged spread of disinformation to the media and alleged errors in his PSR. Initially, the Court sets aside any arguments regarding the murder of Donald Wagner as charged and proven in racketeering Act 2, and as summarized in Defendant's letter to Probation.

The facts subject to racketeering Act 2 were proven at trial, Defendant objected to the PSR at the time of sentencing, Probation submitted an addendum addressing the objections, and the Court adjudicated the objections. ECF No. 2356-1 at 25; PSR at 1–14; *see also* ECF No. 1736 at 4 (noting Court's statement at sentencing that "really no facts in the PSR . . . cannot be confirmed by evidence"); *Warneke*, 310 F.3d at 545 (holding, on Defendant's direct appeal, that "[t]he evidence against [Defendant] is overwhelming, and we do not discuss individual challenges to its sufficiency"). Defendant's challenges to, and relitigation of, those facts are inappropriate in a compassionate release proceeding, both on the extraordinary and compelling prong and the § 3553(a) prong.

As the Second Circuit put it, in response to a defendant's argument on compassionate release that the court should consider the defendant's new evidence and question "the legitimacy of [his] convictions and the accuracy of the . . . PSR,"

> Section 3582(c)(1)(A) directs courts to "consider[ ] the factors set forth in section 3553(a)." Section 3553 in turn provides "[f]actors to be considered *in imposing a sentence*." 18 U.S.C. § 3553(a) (emphasis added). To impose a sentence, there must necessarily be a valid conviction. If a defendant contends his conviction by a federal court is invalid, Congress has provided a vehicle to raise such a challenge through a motion pursuant to 28 U.S.C. § 2255, which imposes particular procedural limitations. A defendant cannot evade this collateral review structure by attacking the validity of his conviction through § 3582. Accordingly, we conclude, arguments challenging the validity of an underlying conviction cannot be raised in a § 3582 motion as part of the § 3553(a) sentencing factors. Rather, such arguments are properly raised on direct appeal or collateral review pursuant to 28 U.S.C. § 2255. Other courts have reached the same conclusion. *See e.g.*, *United States v. Bard*, No. 21-3265, 2022 WL 843485, at *2 (3d Cir. March 22, 2022) (unpublished per

curiam); *United States v. Miller*, 855 F. App'x 949, 950 (5th Cir. 2021) (unpublished per curiam).

*United States v. Amato*, 48 F.4th 61, 64–65 (2d Cir. 2022) (footnote omitted). The Second Circuit also rejected the defendant's argument that the new evidence may be considered under the "district court's broad discretion 'to consider the full slate of extraordinary and compelling reasons' that may warrant an imprisoned person's release." *Id.* at 65–66 (quoting *Brooker*, 976 F.2d at 237). Thus, nothing in the amended policy statement alters this conclusion. And given the Seventh Circuit's precedent on the matter of using compassionate release to circumvent the direct appeal or collateral review processes, *see supra* sources cited in Section 5.1.1.1, the Court has little doubt that the Seventh Circuit would concur.

With respect to the Gauger murders, although Defendant was not charged to be involved with that act, ECF No. 793 at 19–20, the information was properly included in the PSR and considered as relevant conduct under U.S.S.G. § 1B1.3. *See United States v. Morales*, 655 F.3d 608, 638 (7th Cir. 2011) ("As discussed in our analysis of [the co-defendant's] sentence above, the district court must consider conduct relevant to the charged offense when calculating the guidelines-recommended sentence range . . . The reasonably foreseeable actions of the other [gang members] in the racketeering conspiracy can be attributed to [the defendant] for the purposes of sentencing.") (citing U.S.S.G. § 1B1.3 and *United States v. Quintero*, 618 F.3d 746, 755 (7th Cir. 2010)).

The case that Defendant cites to support his argument that the inclusion of this information has made his time in prison more difficult involved a sex offender misclassification based on the PSR. ECF Nos. 2285 at 53 n.29 and 2356 at 22 n.11 (citing *United States v. Fields*, 554 F. Supp. 3d

324, 332 (D.N.H. 2021)). The Court found the misclassification error akin to a sentencing error. *Fields*, 554 F. Supp. 2d at 336 ("[M]any courts have found that sentencing errors constitute an extraordinary and compelling reason for early release.") (collecting cases). Here, there was no such sentencing error. And to the extent Defendant suggests that the inclusion of this information in the PSR, and the Government's alleged spread of this information to the media, is what has driven his attacks, again, fear of attacks is not extraordinary and compelling.

Thus, on balance and for all these reasons, Defendant's proffered bases for release, either alone or in combination, are not extraordinary and compelling.

### 5.2    The § 3553(a) Factors

Having determined that Defendant has not presented an extraordinary and compelling reason warranting his release, the Court is not required to consider the § 3553(a) factors. *See Thacker*, 4 F.4th at 576 ("*Upon a finding* that the prisoner has supplied [an "extraordinary and compelling"] reason, the second step of the analysis requires the district court, in exercising the discretion conferred by the compassionate release statute, to consider any applicable sentencing factors in § 3553(a)." (emphasis added)). However, even if Defendant had demonstrated an extraordinary and compelling reason, the Court's application of the sentencing factors to Defendant strongly counsel against his early release.

At the time of his sentence, the total life sentence that the Court imposed was clearly supported by all of the relevant § 3553(a) factors: (1) the nature and circumstances of the offense, and the history and characteristics of Defendant; (2) the need for the sentence imposed to provide just punishment, deterrence, protection of the public, and

correctional treatment; (3) the kinds of sentences available; (4) the sentencing guideline range; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims of the offense.

Defendant raises several arguments that go towards the § 3553(a) factors, thus allowing the Court to consider not only the circumstances at the time of the original offense, but also post-conviction developments. First, he asserts that the BOP has calculated his Prisoner Assessment Tool Targeting Estimated Risk and Needs ("PATTERN") score "to the lowest level possible," with an "Overall Male PATTERN Risk Level of Minimum." ECF No. 2285 at 34–36 (citing ECF No. 2285-1 at 72–75); ECF No. 2356 at 55 (noting that Defendant has maintained a "Minimum PATTERN score after eight consecutive reassessments").

Defendant argues that "PATTERN is interrelated to an inmate's rehabilitation efforts and prison disciplinary issues," and his "Minimum" score indicates that he "no longer presents the significant risk of danger that his offense suggests." ECF No. 2285 at 36 (quoting *United States v. Greene*, 516 F. Supp. 3d 1, 25 (D.D.C. 2021)). Defendant also contends that remaining in prison "may even adversely affect [his] marked rehabilitation." *Id.* at 36–37 (quoting *United States v. Ezell*, 518 F. Supp. 3d 851, 862 (E.D. Pa. 2021) and citing *United States v. Briggs*, 524 F. Supp. 3d 419, 429 (E.D. Pa. 2021)). Further, Defendant's age may suggest a lower likelihood to recidivate. *Id.* at 37 (citing *United States v. Presley*, 790 F.3d 699, 702 (7th Cir. 2015) and Daniel O'Conner et al., *Violent Offending, Desistance, and Recidivism*, 103 MARQ. L. REV. 983, 1004 (2020)).

Next, Defendant explains several positive developments in his life in the time since the Court's sentence. Throughout his imprisonment, Defendant has "dedicated much of his time studying and learning specific areas of federal criminal and civil law." *Id.* at 40. This has required "original thinking, painstaking networking, resilience, a strong sense of responsibility, as well as great intellectual and emotional energy to effect significant change." *Id.* at 41. He has shared his skills with "numerous inmates," teaching them how to use LexisNexis, prepare non-frivolous court filings, correspond with attorneys, pursue medical treatment through the administrative process, and the like. *Id.* at 41–42. This process has "taught [Defendant] how to make better decisions in life far beyond any schooling he has previously taken," and enabled him to "abandon[] many self-destructive thinking patterns . . . and replac[e] them with more adaptive and healthy ones." *Id.* at 42.

Defendant has also completed many institutional programs, particularly after arriving at USP Atwater in 2013. *Id.* at 43. At that time, Defendant became involved with programming through Psychology Services and Education. *Id.* He completed the Breaking the Cycle, Release Preparation Program, and the Non-Residential Drug Abuser Program. *Id.* at 43–44. The program provider commented that Defendant brings a "mature and prosocial perspective," "has personal goals he is working on," "focus[es] on positive activities," "demonstrates a positive attitude," and "would be a productive member of society." *Id.* at 44 (quoting ECF No. 2285-1 at 104–05). He also completed a Cultural Studies program, an eight-week program on Carrying on With a Life Sentence, a five-session anger management program, and an Optimizing Brain Fitness and Lifelong Health program. *Id.* at 44–45 (citing ECF No. 2285-1 at 109, 111, 113). After

completing these programs at USP Atwater, Defendant's custody level was lowered to medium, and he was transferred to FCI Oxford in 2016. *Id.* at 45.

At FCI Oxford, Defendant enrolled in a four-month program titled 17 Key Principles to Success, and he also completed the Positive Attitude Development program. *Id.* at 46 (citing ECF No. 2285-1 at 118, 121). Defendant also became a facilitator for the Maintaining a Positive Sense of Self program to "address aftercare for like-minded individuals to stay focused on their positive outlook and not drift back to their old ways of thinking." *Id.* at 46 (citing ECF No. 2285-1 at 123). Between 2019 and 2023, Defendant completed dozens of additional mental health and responsibility programs. *Id.* at 47–48 (citing ECF No. 2285-1 at 126–44); ECF No. 2356 at 56 (citing ECF No. 2356-1 at 74–81).

Defendant next raises examples of having risked his well-being to help his fellow inmates and give back to his community. ECF No. 2285 at 50; *see also supra* note 3. For example, one of Defendant's passions has been to aid inmates with "[m]aterially false or misleading information added to plea agreements and presentence reports" with legal support in order to protect them from violence. *Id.* at 52–53 & n.29. Inmates that Defendant has assisted view him as a "mentor, protector, and almost surrogate father." *Id.* at 53–54 (citing and quoting ECF No. 2285-1 at 153, 160).

Defendant also points to his lack of disciplinary history while incarcerated. *Id.* at 54. At the time that he filed his original motion, he had been imprisoned for 25 years and had incurred only two incident reports. *Id.* As context for these reports, Defendant explains that due to his life sentence, he has spent most of his sentence at federal USPs, which have a higher frequency and level of violence. *Id.* at 54–55. During this time, he has not used alcohol, drugs, or tobacco, nor has he used or possessed a weapon.

*Id.* at 56. The first incident report occurred in December 2010 while Defendant was housed at USP Hazelton. *Id.* Defendant tried to mediate a confrontation between two other inmates. *Id.* Both were intoxicated and Defendant believed they possibly had homemade weapons, so he defended himself. *Id.* The other incident report occurred in 2018 while Defendant was at FCI Oxford and involved allowing another inmate's wife to make transfers from Defendant's inmate account for newsletters and legal magazines. *Id.* at 57. When the BOP calculated his minimum PATTERN score, it referenced these incidents as "*de minimis.*" *Id.* at 58 (citing ECF No. 2285-1 at 72–75).

Defendant next states that he has fully paid off his special assessment and restitution, and that he is working towards paying off his fine. *Id.* at 59. Finally, Defendant explains the support he receives from his family and friends and his proposed release plan. *Id.* at 60. He has strong familial support and, if released, would reside with either his mother or sister in North Carolina. *Id.* at 60 (citing ECF No. 2285-1 at 151–58).

With respect to uniformity, Defendant points to the United States Sentencing Commission's statistics as to the average sentence imposed in 2021 involving murder, *see supra* Section 4.4, and he provides two lengthy compilations of cases where courts have granted compassionate release or reduced sentences in cases involving murder or other violent offenses. ECF No. 2356 at 42 (citing ECF No. 2356-1 at 45–60); ECF No. 2356-1 at 62–67. Defendant also asserts that the "significant stretch of time" that he has served reflects the seriousness of his offense and provides just punishment, particularly when juxtaposed with his co-defendant's 15-year sentence. ECF No. 2356 at 43; *id.* at 32 n.16 (citing *United States v. Russo*, 643 F. Supp. 3d 325, 335 (E.D.N.Y. 2022) ("[T]he same sentencing disparities between

defendants who chose to exercise their constitutional right to trial and those who took plea deals—even though they were also indicted on murder charges—is not only is a factor worthy of consideration as an extraordinary circumstance, but also is a powerful § 3553(a) factor.")). To hold otherwise, Defendant argues, "might signal to other criminals that if they run far enough and fast enough for long enough, they may have the opportunity to ultimately serve a *shorter* sentence." *Id.* at 43–44 (quoting *United States v. Hallahan*, No. 1:12-CR-10054, 2020 WL 4193112, at *4 (C.D. Ill. July 21, 2020)).

The Court has considered all of Defendant's legal arguments and positive developments and commends him for the same. His briefing is well researched, developed, and thought out, and it is clear that he has been using his time in prison productively. However, the severity of Defendant's crimes overwhelms the analysis in this case.

Defendant served as the president of his chapter of the Outlaws. PSR at 5.[16] He led the Outlaws in a years-long war with rival motorcycle gangs, which was fueled purely by jealous rivalry. *Id.* at 5–6. Much of his conduct involved organizing and directing fellow Outlaws to act. For example, he worked with a co-defendant to transport a homemade bomb in a fire extinguisher to target the rival Hell's Henchmen gang. *Id.* at 6. When the bomb detonated, three police officers were sent to the hospital, and one suffered permanent hearing loss. *Id.* Defendant received insignia for this act to represent his commission of violence on behalf of the Outlaws. *Id.* at 5, 6. Defendant directed and orchestrated the murder of Donald Wagner over a load of marijuana. *Id.* at 6–7. Defendant supervised and directed the placement of a bomb on a truck belonging to a member of the rival Hell's

---

[16] *See supra* Section 5.1.2 regarding the propriety of considering the facts set forth in the PSR with the § 3553(a) factors on compassionate release.

Angels gang. *Id.* at 9. Defendant delivered orders to other Outlaws, who had been provided with an AK-47 assault rifle, to shoot a lead motorcycle rider of the Hell's Henchmen while they were on a motorcycle "run," with the hope of setting off "a chain reaction," ostensibly of harm to other bikers in the pack. *Id.* at 10.

Defendant provided other Outlaws members with a map identifying the motorcycle shop of a member of the Hell's Henchmen and instructed them to kill him. *Id.* at 11–12. The murder took place as scheduled. *Id.* at 12. Defendant organized a crew of Outlaws to travel to Buffalo, New York while heavily armed to engage in a confrontation with members of the Hell's Angels. *Id.* at 13. Defendant supervised the truck bombing of a Hell's Henchmen member, which caused permanent injuries to that individual's legs. *Id.* at 14. Defendant supervised a bombing of the Hell's Henchmen/Hell's Angels Chicago clubhouse. *Id.* Defendant provided a vehicle for a drive-by shooting of a Chicago Hell's Henchmen member and then undertook disposal of the vehicle. *Id.* at 15. Defendant planned a murder of a Chicago Hell's Henchmen member who was believed to have initiated a fire at an Outlaws clubhouse. *Id.* at 16. The list only goes on.

Throughout his time with the Outlaws, Defendant made it known to fellow Outlaws, rival gang members, and unassuming members of the public alike that they best not question his directives or his loyalty to the Outlaws. In the nearly 37 years that this judge has been on the bench, Defendant's conduct remains among the most serious, violent, and pervasive that the Court has seen. While, as noted, Defendant has used his time in prison productively and worked towards rehabilitation, he continues to challenge the jury's determination of his level of involvement in these offenses, as evidenced throughout these compassionate release

proceedings. Mounting a robust defense is one thing, and Defendant was and is entitled to do so—and has—but repeatedly challenging factual issues that have long been decided by the jury, on direct appeal, on collateral review, and in ancillary Freedom of Information Act litigation, is another altogether. Defendant's eagerness to blame anyone but himself suggests that his rehabilitation may still be ongoing.

As to uniformity, the Court has denied the compassionate release motions of all of Defendant's co-defendants with life sentences, and the same result is compelled here. ECF Nos. 2276, 2299, 2330. The community's healing requires time and adequately served punishment. Perhaps this case will one day be ripe for compassionate release, but 27 years served is not yet sufficient time for the community's hurt from Defendant's actions to be healed by his punishment. Thus, the § 3553(a) factors strongly counsel against Defendant's early release.

## 6.   CONCLUSION

For the reasons set forth above, the Court denies Defendant's motion and supplemental motion for compassionate release. ECF Nos. 2285, 2356. It also denies Defendant's motion to compel the BOP to release surveillance video, ECF No. 2317, but grants Defendant's motion for judicial notice, ECF No. 2323. The Court grants Defendant's motions to restrict, and it grants the Government's motions to seal, as modified such that the subject documents are restricted from the public's view rather than sealed.

Accordingly,

**IT IS ORDERED** that Defendant Kevin P. O'Neill's motions to restrict access, ECF Nos. 2316, 2324, 2331, 2337, 2355, 2363, 2367, be and the same are hereby **GRANTED**; the documents docketed at ECF Nos. 2317,

2323, 2332, 2338, 2356, 2364, and 2368 shall remain in restricted form until further order of the Court;

IT IS FURTHER ORDERED that the Government's motions to seal, ECF Nos. 2339, 2361, be and the same are hereby **GRANTED as modified**; the documents docketed at ECF Nos. 2340 and 2362 shall remain in restricted form until further order of the Court;

IT IS FURTHER ORDERED that Defendant Kevin P. O'Neill's motion for judicial notice, ECF No. 2323, be and the same is hereby **GRANTED**;

IT IS FURTHER ORDERED that Defendant Kevin P. O'Neill's motion to compel the Bureau of Prisons to release surveillance video, ECF No. 2317, be and the same is hereby **DENIED**; and

IT IS FURTHER ORDERED that Defendant Kevin P. O'Neill's motion for compassionate release, ECF No. 2285, and supplemental motion for compassionate release, ECF No. 2356, be and the same are hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 23rd day of May, 2024.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge